**HEB MINISTRIES, INC., Southern Bible Institute, and Hispanic Bible Institute, Petitioners,**

v.

**TEXAS HIGHER EDUCATION COORDINATING BOARD and Commissioner Raymund Paredes, Respondents.**

No. 03–0995.

Supreme Court of Texas.

Argued Jan. 5, 2005.

Decided Aug. 31, 2007.

J. Shelby Sharpe, Sharpe & Tillman, P.C., Fort Worth, Raul A. Gonzalez Jr., Law Office of Raul A. Gonzalez, Amalia Rodriguez Mendoza, Travis County District Clerk, Austin, Kelly J. Shackelford, Hiram S. Sasser III, Liberty Legal Institute, Plano, for Petitioner.

Melanie Plowman Sarwal, Weil, Gothshal & Manges LLP, Greg Abbott, Barry Ross McBee, Office of the Attorney General, Jeffrey S. Boyd, Thompson & Knight LLP, Jeffrey L. Rose, Dan Morales, Toni Hunter, Gray & Becker, P.C., Paul Matula, Asst. Atty. Gen., Edward D. Burbach, Office of the Attorney General, Rafael Edward Cruz, Attorney General of Texas, Amy Warr, Alexander Dubose Jones & Townsend, LLP, Austin, Andy Taylor, Andy Taylor and Associates, P.C., Houston, for Respondent.

Douglas Laycock, University of Texas School of Law, Patricia Valdreace Hayes, Austin,

Kathleen Ann Reilly Barrow, Whitaker, Chalk, Swindle & Sawyer, L.L.P., Fort Worth, for amicus curiae Southwestern Baptist Theological Seminary.

Trevor Boyd Hall, Cokinos, Bosien & Young, Arlington, for amicus curiae David Barton.

Trevor Boyd Hall, Cokinos, Bosien & Young, Arlington, for amicus curiae for Wallbuilders.

Patricia Valdreace Hayes, Austin, for amicus curiae Independent Colleges and Universities of Texas, Inc.

Allan E. Parker, Texas Justice Foundation, San Antonio, for amicus curiae David Barton and Wallbuilders, The Indepenent Baptist College and International Bible Center.

James J. S. Johnson, Dallas, for amicus curiae Texas Fellowship of Christian College Professors.

Justice HECHT announced the judgment of the Court and delivered the opinion for the Court with respect to Part I, in which Chief Justice JEFFERSON, Justice O'NEILL, Justice WAINWRIGHT, Justice BRISTER, Justice MEDINA, Justice GREEN, and Justice JOHNSON joined, and with respect to Part III–B, in which Chief Justice JEFFERSON, Justice O'NEILL, Justice BRISTER, Justice MEDINA, and Justice GREEN joined, and an opinion with respect to Parts II, III–A, and III–C, in which Justice O'NEILL, Justice BRISTER, and Justice MEDINA joined.

The State of Texas requires a private post-secondary school to meet prescribed standards before it may call itself a "seminary" or use words like "degree", "associate", "bachelor", "master", and "doctor"— or their equivalents—to recognize attainment in religious education and training. We must decide whether this requirement impermissibly intrudes upon religious freedom protected by the United States and Texas Constitutions. We hold it does and therefore reverse the judgment of the

court of appeals [1] and remand the case to the trial court for further proceedings.

# I

## A

The State of Texas goes to great lengths to ban "diploma mills"—what *Webster's Dictionary* defines as "institution[s] of higher education operating without supervision of a state or professional agency and granting diplomas which are either fraudulent or because of the lack of proper standards worthless".[2] The Higher Education Coordinating Act of 1965, codified as chapter 61 of the Texas Education Code,[3] states that "the policy and purpose of the State of Texas [are] to prevent deception of the public resulting from the conferring and use of fraudulent or substandard college and university degrees [and] to regulate the use of academic terminology in naming or otherwise designating educational institutions, the advertising, solicitation or representation by educational institutions or their agents, and the maintenance and preservation of essential academic records." [4]

To achieve this purpose, subchapter G of the Act denies a "private post-secondary educational institution" [5] use of certain terminology common to graduate education unless it has a certificate of authority from the Texas Higher Education Coordinating Board.[6] Section 61.313 restricts what an institution can call itself. As originally enacted in 1975, it restricted use of only the terms "college" and "university",[7] but its reach was broadened in 1997 and now states in part:

(a) Unless the institution has been issued a certificate of authority under this subchapter, a person may not:

---

1. 114 S.W.3d 617 (Tex.App.-Austin 2003).

2. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 638 (1981).

3. TEX EDUC.CODE §§ 61.001–.9732.

4. *Id.* § 61.301.

5. *Id.* § 61.302(2) (" 'Private postsecondary educational institution' or 'institution' means an educational institution which: (A) is not an institution of higher education as defined by Section 61.003 [generally, a public school]; (B) is incorporated under the laws of this state, maintains a place of business in this state, has a representative present in this state, or solicits business in this state; and (C) furnishes or offers to furnish courses of instruction in person, by electronic media, or by correspondence leading to a degree or providing credits alleged to be applicable to a degree."); *id.* § 61.003(8) (" 'Institution of higher education' means any public technical institute, public junior college, public senior college or university, medical or dental unit, public state college, or other agency of higher education as defined in this section."). An exception for certain non-profit schools, *id.* § 61.313(d), and a "grandfather" exception, *id.* § 61.313(e)-(g), are not relevant here.

6. *Id.* § 61.021(a) ("The Texas Higher Education Coordinating Board is an agency of the state ...."); *id.* § 61.002(a) ("[The Board] provide[s] leadership and coordination for the Texas higher education system, institutions, and governing boards, to the end that the State of Texas may achieve excellence for college education of its youth through the efficient and effective utilization and concentration of all available resources and the elimination of costly duplication in program offerings, faculties, and physical plants."); *id.* § 61.022(a) ("The board shall consist of nine members appointed by the governor so as to provide representation from all areas of the state.... Members of the board serve staggered six-year terms.").

7. Act of May 27, 1975, 64th Leg., R.S., ch. 587, § 1, 1975 Tex. Gen. Laws 1867, 1870 ("No person may use the term 'college' or 'university' in the official name or title of a private institution of higher education established after the effective date of this subchapter and subject to its provisions unless the institution has been issued a certificate of authority to grant a degree or degrees.").

(1) use the term "college," "university," "seminary," "school of medicine," "medical school," "health science center," "school of law," "law school," or "law center" in the official name or title of a nonexempt private postsecondary educational institution; or

(2) describe an institution using a term listed in Subdivision (1) or a term having a similar meaning.[8]

Section 61.304 restricts the designations of educational attainment an institution may use. In 1998, when the events in this case occurred, section 61.304 stated:

A person may not grant or award a degree on behalf of a private postsecondary educational institution unless the institution has been issued a certificate of authority to grant the degree by the board in accordance with the provisions of this subchapter. A person may not represent that credits earned or granted by that person or institution are applicable for credit toward a degree to be granted by some other person or institution except under conditions and in a manner specified and approved by the board. The board is empowered to specify and regulate the manner, condition, and language used by an institution or person or agents thereof in making known that the person or institution holds a certificate of authority and the interpretation of the significance of such certificate.[9]

Current section 61.302(1) defines "degree" expansively:

"Degree" means any title or designation, mark, abbreviation, appellation, or series of letters or words, including associate, bachelor's, master's, doctor's, and their equivalents, which signifies, purports to, or is generally taken to signify satisfactory completion of the requirements of all or part of a program of study leading to an associate, bachelor's, master's, or doctor's degree or its equivalent.[10]

As section 61.301 explains:

Because degrees and equivalent indicators of educational attainment are used by employers in judging the training of prospective employees, by public and private professional groups in determin-

---

8. Tex. Educ.Code § 61.313(a). *See also id.* § 61.313(c) ("A person may not use the term 'college,' 'university,' 'seminary,' 'school of medicine,' 'medical school,' 'health science center,' 'school of law,' 'law school,' or 'law center' in the official name or title of an educational or training establishment.") and (d) ("This section does not apply to an institution of higher education or a private institution of higher education as defined by Section 61.003."); *id.* §§ 61.003(8), (15)("Private or independent institution of higher education" is one, *inter alia*, organized as non-profits, tax-exempt under Tex. Const. art. VIII § 2 and federal statute, and accredited by certain entities), § 61.302(9) (" 'Educational or training establishment' means an enterprise offering a course of instruction, education, or training that the establishment does not represent to be applicable to a degree.").

9. Act of May 25, 1993, 73rd Leg., R.S., ch. 516, § 7, 1993 Tex. Gen. Laws 1949, 1950,

formerly Tex. Educ.Code § 61.304. A 2005 amendment added "or offer to grant or award a degree" to the first sentence, assigned these three sentences, respectively, to subsections (a) through (c), and added new subparagraphs (d)-(f). Act of May 25, 2005, 79th Leg., R.S., ch. 1039, § 3, 2005 Tex. Gen. Laws 3499, 3500.

10. Tex. Educ Code § 61.302(1); *see also* 19 Tex. Admin. Code § 7.3(7) (2007) ("Degree—Any title or designation, mark, abbreviation, appellation, or series of letters or words, including 'associate', 'bachelor's', 'master's', 'doctor's' and their equivalents and foreign cognates, which signify, purport to signify, or are generally taken to signify satisfactory completion of the requirements of all or part of a program of study which is generally regarded and accepted as an academic degree-level program by accrediting agencies recognized by the Board.").

ing qualifications for admission to and continuance of practice, and by the general public in assessing the competence of persons engaged in a wide range of activities necessary to the general welfare, regulation by law of the evidences of college and university educational attainment is in the public interest. To the same end the protection of legitimate institutions and of those holding degrees from them is also in the public interest.[11]

To obtain a certificate of authority,[12] an institution must satisfy the Coordinating Board that it meets standards the Board has adopted.[13] There are 21 at present.[14] In 1998, the standards were substantively similar but numbered 24.[15] According to the Board, its standards "represent generally accepted administrative and academic practices and principles of accredited institutions of higher education in Texas" and "are generally set forth by regional and specialized accrediting bodies."[16] The standards are lengthy, detailed, rigorous, and comprehensive, covering every aspect

of an institution's operation. Some are quite explicit, like these:

- "Each faculty member teaching in an academic associate or baccalaureate level degree program shall have at least a master's degree from an institution accredited by a recognized agency or a regional accrediting agency with at least 18 graduate semester credit hours in the discipline being taught. Furthermore, at least 25% of course work in an academic associate or baccalaureate level major shall be taught by faculty members holding doctorates, or other terminal degrees, in the discipline being taught from institutions accredited by a recognized agency or a regional accrediting agency.... Graduate level degree programs shall be taught by faculty holding doctorates, or other terminal degrees, in the discipline being taught from institutions accredited by a recognized agency or a regional accrediting agency." [17]

---

11. Tex. Educ.Code § 61.301.

12. 19 Tex. Admin. Code § 7.3(4) (2007) ("Certificate of authority—The Board's approval of institutions of higher education, (other than exempt institutions) with operations in the state of Texas, to confer degrees or courses applicable to degrees, or to solicit students for enrollment in institutions that confer degrees or courses applicable to degrees.").

13. Tex. Educ.Code § 61.306(a) ("The board may issue a certificate of authority to grant a degree or degrees and to enroll students for courses which may be applicable toward a degree if it finds that the applicant meets the standards established by the board for certification.").

14. 19 Tex. Admin. Code § 7.7(1)-(21) (2007).

15. 19 Tex. Admin. Code § 5.214(a)(1)-(24) (1998), *adopted* 22 Tex. Reg. 11353, 11355–11357, (Nov. 21, 1997).

16. 19 Tex. Admin. Code § 7.7 (2007); 19 Tex. Admin. Code § 5.214(a) (1998) (referring to

standards "generally set forth by the Commission on Colleges, Southern Association of Colleges and Schools and by specialized accrediting bodies and several academic and professional societies....").

17. 19 Tex. Admin. Code § 5.214(a)(5) (1998); *accord* 19 Tex. Admin. Code § 7.7(9)(A), (B) & (E) (2007). In 2005, a caveat was added to these requirements for persons with exceptional experience. *Id.* § 7.7(9)(F) ("With the approval of a majority of the institution's governing board, an individual with exceptional experience in the field of appointment, which may include direct and relevant work experience, professional licensure and certification, honors and awards, continuous documented excellence in teaching, or other demonstrated competencies and achievements, may serve as a faculty member without the degree credentials specified above. Such appointments shall be limited and the justification for appointment fully documented. The Coordinating Board shall evaluate the qualifications of the full complement of faculty providing in-

- "Each associate or baccalaureate degree program shall contain a general education component consisting of at least 25% of the total hours offered for the program. This component shall be drawn from each of the following areas: Humanities and Fine Arts, Social and Behavioral Sciences, and Natural Sciences and Mathematics."[18]

Other standards leave much to the Coordinating Board's discretion to determine compliance:

- "The character, education, and experience in higher education of governing board members, administrators, supervisors, counselors, agents, and other institutional officers shall be such as may reasonably ensure that the students will receive education consistent with the objectives of the course or program of study."[19]

- "There shall be sufficient distinction among the roles and personnel of the governing board of the institution, the administration, and faculty to ensure their appropriate separation and independence."[20]

- "The character, education, and experience in higher education of the faculty shall be such as may reasonably ensure that the students will receive an education consistent with the objectives of the course or program of study."[21]

- "There shall be a sufficient number of full-time teaching faculty resident and accessible to ensure continuity and stability of the education program, adequate educational association between students and faculty and among the faculty members, and adequate opportunity for proper preparation for instruction and professional growth by faculty members."[22]

- "The quality, content, and sequence of each course, curriculum, or program of instruction, training, or study shall be appropriate to the purpose of the institution and shall be such that the institution may reasonably and adequately achieve the stated objectives of the course or program."[23]

- · "The institution shall have adequate space, equipment, [and] instructional

---

struction at the institution to determine that such appointments are justified and make up a small percentage of the faculty as a whole."), *adopted* 30 Tex. Reg. 2663 (May 6, 2005). In 2006, an additional requirement was added. *Id.* § 7.7(2)(B) ("The chief academic officer shall hold an earned doctorate awarded by an institution accredited by an agency recognized by the Board or from a foreign institution demonstrated to be equivalent to an accredited institution, and shall demonstrate sound aptitude for and experience with curriculum development and assessment; accreditation standards and processes as well as all relevant state regulations; leadership and development of faculty, including the promotion of scholarship, research, service, academic freedom and responsibility, and tenure (where applicable); and the promotion of student success."), *adopted* 31 Tex. Reg. 6327 (Aug. 11, 2006).

**18.** 19 Tex. Admin. Code § 5.214(a)(8) (1998); *accord* 19 Tex. Admin. Code § 7.7(13)(A)-(B) (2007).

**19.** 19 Tex. Admin. Code § 5.214(a)(1) (1998); *accord* 19 Tex. Admin Code § 7.7(2) (2007).

**20.** 19 Tex. Admin Code § 5.214(a)(3) (1998); *accord* 19 Tex. Admin. Code § 7.7(4) (2007).

**21.** 19 Tex. Admin Code § 5.214(a)(5) (1998); *accord* 19 Tex. Admin. Code § 7.7(9) (2007).

**22.** 19 Tex. Admin Code § 5.214(a)(6) (1998); *accord* 19 Tex. Admin. Code § 7.7(10) (2007).

**23.** 19 Tex. Admin Code § 5.214(a)(7) (1998); *accord* 19 Tex. Admin. Code § 7.7(12)(A) (2007).

materials to provide education of good quality." [24]

- "The institution shall have adequate financial resources and financial stability to provide education of good quality and to be able to fulfill its commitments to students." [25]

- "The institution shall adopt and distribute to all members of the faculty a statement of academic freedom assuring freedom in teaching, research, and publication." [26]

A certificate of authority is valid for two years,[27] and an institution must apply for renewal 180 days before the certificate expires.[28] A certificate can be renewed for

only eight years, by which time the institution must obtain full accreditation.[29]

An institution is exempt from subchapter G if it is fully accredited by a "recognized accrediting agency" designated by the Coordinating Board.[30] In 1998, the Board had designated only three accrediting agencies, two of which were specifically oriented toward religious institutions.[31] Since then, four others have been added, none with a religious focus.[32] Although no recognized accrediting agency's standards are included in the record, for Board recognition, an accrediting agency's standards "must be at least as comprehensive and rigorous as [the Board's standards for a certificate of authority] and be as rigorously applied." [33] An exempt institution may,

**24.** 19 Tex. Admin Code § 5.214(a)(11) (1998); *accord* 19 Tex. Admin. Code § 7.7(16) (2007).

**25.** 19 Tex. Admin Code § 5.214(a)(12) (1998); *accord* 19 Tex. Admin. Code § 7.7(5) (2007).

**26.** 19 Tex. Admin. Code § 5.214(a)(14) (1998); *accord* 19 Tex. Admin. Code § 7.7(11) (2007).

**27.** Tex. Educ.Code § 61.306(b) ("A certificate of authority to grant a degree or degrees is valid for a period of two years from the date of issuance.").

**28.** *Id.* § 61.308(a) ("A private postsecondary educational institution which desires to renew its certificate of authority shall apply to the board at least 180 days prior to the expiration of the current certificate.")

**29.** 19 Tex. Admin. Code § 5.215(d)(3) (1998) ("An institution may be granted consecutive certificates of authority for no longer than eight years. Absent sufficient cause, at the end of the eight years, the institution must have been accredited by a recognized accrediting agency."); *accord* 19 Tex Admin. Code § 7.6(c)(3) (2007).

**30.** Tex. Educ.Code § 61.303(a) ("The provisions of this subchapter do not in any way apply to an institution which is fully accredited by a recognized accrediting agency."); *id.* § 61.302(8) (" 'Recognized accrediting agency' means an association or organization so

designated by rule of the board for the purposes of this subchapter.").

**31.** 19 Tex. Admin. Code § 5.211 (1998), *adopted* 22 Tex. Reg. 11353 (Nov. 21, 1997) ("Recognized accrediting agency—The Commission on Colleges, Southern Association of Colleges and Schools; the American Association of Bible Colleges; or the Association of Theological Schools in the United States and Canada.").

**32.** 19 Tex Admin. Code § 7.4(a)(1) (2007) ("For purposes of the exemption, the Board currently recognizes the following accrediting agencies: the Commission on Higher Education, Middle States Association of Colleges and Schools; the Commission on Institutions of Higher Education, New England Association of Schools and Colleges; the Commission on Institutions of Higher Education, North Central Association of Colleges and Schools; the Northwest Commission on Colleges and Universities, the Commission on Colleges, Southern Association of Colleges and Schools; the Accrediting Commission for Community and Junior Colleges and Accrediting Commission for Senior Colleges and Universities, Western Association of Schools and Colleges; the Association of Biblical Higher Education (undergraduate only); and the Association of Theological Schools in the United States and Canada.").

**33.** 19 Tex. Admin. Code § 5.213(i)(2) (1998); *accord* Tex. Admin. Code § 7.5(f)(2) (2007).

and according to the Board *should*, obtain a certificate of authorization,[34] which is not to be confused with a certificate of authority.[35]

In sum, with a few exceptions, none material to this case, subchapter G of the Act requires that a private post-secondary institution either have Board-approved accreditation or satisfy Board-adopted standards before it can describe itself and its students' attainments with words commonly used for those purposes by such institutions. A violation is a Class A misdemeanor,[36] may be investigated and enjoined by the Attorney General,[37] is punishable by a civil penalty of $1,000 per day [38] and an administrative penalty of $1,000–5,000 per offense [39] imposed by the Commissioner of Higher Education, the Board's executive officer,[40] and is a false, misleading, or de-

34. Tex. Educ.Code § 61.303(c) ("An exempt institution or person may be issued a certificate of authorization to grant degrees."); 19 Tex. Admin. Code § 7.4(d) (2007) ("A new institution may not presume exempt status and offer to award degrees or courses leading to degrees until it has applied for and been granted a certificate of authorization by the Commissioner."); *id.* § 7.3(5) ("Certificate of authorization—The Board's acknowledgment that an institution is qualified for an exemption from the regulations herein.").

35. 28 Tex. Reg. 4131 (May 23, 2003) (explaining that the regulations were being amended to "add definitions of 'certificate of authority' and of 'certificate of authorization' to explain the different types of certificates available to institutions").

36. Tex. Educ.Code § 61.304(d) ("A person commits an offense if the person: (1) grants or awards a degree or offers to grant or award a degree in violation of this section ...."); *id.* § 61.304(e) ("An offense under Subsection (d) is a Class A misdemeanor."); *id.* § 61.313(h) ("A person commits an offense if the person: (1) uses a term in violation of this section ...."); *id.* § 61.313(i) ("An offense under Subsection (h) is a Class A misdemeanor."); TEX. PENAL CODE § 12.21 ("An individual adjudged guilty of a Class A misdemeanor shall be punished by: (1) a fine not to exceed $4,000; (2) confinement in jail for a term not to exceed one year; or (3) both such fine and confinement.").

37. Tex. Educ.Code § 61.318(a) ("The commissioner may report information concerning a possible violation of this subchapter to the attorney general. The attorney general shall make the necessary investigations and shall bring suit to enjoin any violation of this subchapter.").

38. *Id.* § 61.319(a) ("A person who violates this subchapter or a rule adopted under this subchapter is liable for a civil penalty in addition to any injunctive relief or any other remedy. A civil penalty may not exceed $1,000 a day for each violation.").

39. *Id.* § 61.316(a) ("If a person violates a provision of this subchapter, the commissioner may assess an administrative penalty against the person as provided by this section ...."); *id.* § 61.316(b) ("Any person who confers or offers to confer a degree on behalf of a private postsecondary educational institution subject to the provisions of this subchapter which has not been issued a certificate of authority to grant degrees or who represents that credits earned or granted by that person or institution are applicable for credit toward a degree to be granted by another person or institution except under conditions and in a manner specified and approved by the board shall be assessed an administrative penalty of not less than $1,000 or more than $5,000. Each degree conferred without authority constitutes a separate offense."); *id.* § 61.316(c) ("Any person who establishes a private postsecondary educational institution that is not exempt from this subchapter and uses a term protected under this subchapter in the official name of the institution without first having been issued a certificate of authority for the institution under this subchapter or any person who establishes an educational or training establishment and uses a term protected under this subchapter in the official name or title of the establishment shall be assessed an administrative penalty of not less than $1,000 or more than $3,000.").

40. *Id.* § 61.028(a) ("The board shall appoint a commissioner of higher education, who shall select and supervise the board's staff and perform other duties delegated to him by the

ceptive act or practice actionable under the Texas Deceptive Trade Practices–Consumer Protection Act.[41]

**B**

The parties have stipulated to all the facts.

Petitioner HEB Ministries, Inc., a church in Fort Worth,[42] operates a school, Tyndale Theological Seminary and Bible Institute, which was founded in the early 1990s to offer a biblical education in preparation for ministry in churches and missions. By 1999, its campus consisted of a library, four or five classrooms, administrative offices, a small bookstore, and a computer department, and its enrollment was 300–350 students, with over three-fourths in correspondence courses. Tyndale is a "private postsecondary educational institution" as defined by subchapter G.

Tyndale's 1997–1998 course catalog stated:

At TYNDALE our focus is upon you—the professional minister or motivated layman who wishes to make a difference for Christ in our world. You are the most important part of the TYNDALE equation. Our job is to meet your needs—to meet you half-way with quality Bible courses that help you in your ministry endeavor.

The catalog also contained a lengthy "Doctrinal Statement" setting out Tyndale's positions on issues of faith.[43] The catalog listed 172 courses, 162 of which were in religious subjects. Of the other ten, three were in general education— "Basic English Grammar & Composition", "Read, Research & Study Basics", and "Ancient World History"—and seven were in typing, word processing, and use of the Internet, offered by the "Department of Theological and Biblical Research". The catalog offered 20 "diplomas", all in religious subjects.[44]

board. The commissioner shall serve at the pleasure of the board."); 19 Tex. Admin. Code § 7.16(a) (2007) ("If a person or institution violates a provision of this subchapter, the Commissioner may assess an administrative penalty against the person or institution as provided in this section."); 19 Tex. Admin. Code § 5.221(a) (1998) ("If a person violates a provision of this subchapter, the commissioner may assess an administrative penalty against the person as provided by law.").

**41.** Tex. Educ.Code § 61.320(a) ("A person who violates this subchapter commits a false, misleading, or deceptive act or practice within the meaning of Section 17.46, Business & Commerce Code.").

**42.** "HEB" refers to the Hurst–Euless–Bedford area between Fort Worth and Dallas.

**43.** These were captioned "The Scriptures", "The Godhead", "Angels, Fallen and Unfallen", "Man, Created and Fallen", "God's Eternal Purpose", "The First Advent of Christ", "Salvation Only Through Christ", "The Extent of Salvation", "Eternal Security", "The Holy Spirit", "The Great Commis-

sion", "The Blessed Hope", "The Tribulation", "The Second Coming of Christ", "The Eternal State", "Current Issues", and "Women and Ministry".

**44.** These were: "Certificate of Biblical Studies"; "Diploma of Basic Biblical Studies"; "Associate Level Diploma of Biblical Studies"; "Diploma of Advanced Biblical Studies"; "Diploma of Theological Studies"; "Diploma of Christian Studies"; "Graduate Diploma" in "Systematic Theology" and in "Ministry and Christian Counseling"; "Master of Arts Level Diploma" in "General Biblical Studies", in "Counseling", in "Apologetics", in "Languages", and in "Missions"; "Doctor of Ministries Level Diploma" in "General Biblical Studies" and in "Counseling"; "Master of Ministries Level Diploma"; "Master of Systematic Theology Level Diploma"; "Doctor of Theology Level Diploma"; "Doctor of Theology Level Diploma in Prophetic Studies"; and "Ph.D. Level Diploma in Prophetic Studies". The counseling programs were expressly religious and not secular, and the language programs were for biblical study.

Tyndale's catalog offered no "diploma" in any secular subject and no "degree" of any kind, but it characterized programs of study required for a diploma as equivalent to programs of study required for a degree at the same level. For example, the catalog referred to its "Diploma Of Theological Studies" program as a "bachelor equivalent program" and "bachelor equivalent course of studies", and the "Master of Arts Level Diploma" in "Counseling" as a "Masters Level Program".[45]

The course catalog did not state that Tyndale's diplomas were the equivalent of college degrees, but neither did it state that they were not; it was silent on the subject. The catalog stated that Tyndale and Louisiana Baptist Theological Seminary were "going forward with parallel programs [in prophetic studies] and exchange of credits between the two institutions", but did not otherwise say that Tyndale academic credits could be applied toward earning degrees.

In 1998, Tyndale had never been accredited by an agency recognized by the Coordinating Board and had never obtained a certificate of authority from the Board. Tyndale never sought accreditation or a certificate of authority for what it describes as "doctrinal reasons". In its 1997–1998 course catalog, Tyndale described its position on accreditation as follows:

> Many seminaries are on shifting sands. They feel they must impress the world or the culture with their intellectualism. Thus, some schools are spending large sums of money on appearance and are no longer focusing on the substance—strong theology, solid Bible courses, practical language exegesis, etc.
>
> What validates TYNDALE? TYNDALE believes it is affirmed by its Board of Advisors, Board of Governors, the students attending and, the world-class Guest Faculty who give our students the best of academics and the greatest training in the spiritual message of the Scriptures. But again, many schools seek RECOGNITION and AFFIRMATION from the state, from secular associations or professional groups that really have no business meddling in biblical matters.
>
> The approach of many seminaries and Bible schools is obsolete and antiquated. They are still trying to be, as they call it, "traditional" schools. But mainly, they simply try to keep up with the Joneses. They attempt to look and act like secular universities. But in reality, a school like TYNDALE, and other schools with our convictions, are the ones that are traditional, not the other way around.
>
> For example, in the 1960s, most Christian schools were not accredited, nor did the best want to be. They were satisfied with serving the Lord by being complete and whole within their framework and calling. As well, a student could get the best education at these institutions and know he had not been compromised with the culture. But in the 1970s, a push was on for state approval and accreditation. "We want state and federal government approval. We want the world to like us?" [sic] Did any of this have anything to do with the quality or teaching message of those

---

45. This would violate current regulations. 19 Tex. Admin. Code § 7.14(a)(2) ("A person or institution may not ... represent that credits earned or granted are collegiate in nature, including describing them as 'college-level,' or at the level of any protected academic term ...."), *adopted* 31 Tex. Reg. 1023 (Feb. 17, 2006).

schools? It did not! When one of the big seminaries became accredited in the 1970s, almost all of the older faculty and all of the graduates testify that the school went down hill—not in a certain secular quality manner, but in its message and commitment to truth and the Gospel.

One of the largest Christian Universities in America has said, "We will not become accredited!" That school today is highly respected and other schools want their graduates. Accreditation or lack of it has not had anything to do with the school's quality or mission.

At commencement exercises on June 26, 1998, Tyndale recognized graduates with 34 awards, listed in the program with titles as follows:

- "Certificate of Biblical Studies (Cert. BS)"—two;
- "Diploma of Basic Biblical Studies (Dip. BBS)"—three;
- "Associate of Biblical Studies (ABS)"—one;
- "Diploma of Advanced Biblical Studies (Dip. ABS)"—one;
- "Bachelor Level Diploma in Biblical Studies (BBS)"—two;
- "Bachelor Level Diploma in Theological Studies (Dip. Th.S.)"—six;
- "Diploma of Christian Studies (DCS)"—two;
- "Master of Arts (MA)"—nine;
- "Master of Theology (Th.M.)—two;
- "Doctor of Ministries (D.Min)"—one;
- "Doctor of Theology (Th.D)"—two;
- "Doctor of Philosophy (Ph.D)"—three.

The record contains a copy of only one of the award certificates. It read:

Tyndale Theological Seminary
Fort Worth, Texas
To Whom it may concern
[recipient's name]
Has completed satisfactorily the course of Theological studies offered by
the faculty of this institution and is entitled
to the following diploma: The aequus Master of Arts Level Diploma
And the same is hereby conferred by the authority of the board
and faculty as recommended by the president.
June 26, 1998

In conferring these awards, Tyndale did not use the word "degree". Nevertheless, the Commissioner of Higher Education sent Tyndale a letter dated July 22, 1998, which stated:

As you know, the Texas Education Code, Chapter 61, Subchapter G, requires an institution to have a certificate of authority to grant degrees, credits applicable to degrees, or to use specific academic terminology. I have determined that Tyndale Theological Seminary & Biblical Institute is violating this statute. Under Section 61.316, the Commissioner must assess penalties for violations. Those penalties may range from $1,000 to $3,000 for use of a protected term in the institution's name and from $1,000 to $5,000 for awarding or offering to award degrees. Each degree awarded or offered constitutes a separate offense.

From the evidence we possess, I conclude the following:
- Tyndale meets the definition of a private postsecondary institution in Texas as found in § 61.302(2);
- Tyndale was informed that the law requires it must hold a certificate of authority from the Coordinating Board to grant degrees, grant credits

applicable to degrees, or use protected terminology in a letter from the Coordinating Board dated September 16, 1991;

- On or about June 26, 1998, Tyndale awarded six undergraduate certificates (consisting of courses alleged to be applicable to degrees), one associate degree, eight bachelor's degrees, two diplomas of Christian Studies (accepted as a baccalaureate equivalent for admission to your master's programs), eleven master's degrees, and six doctoral degrees for a total of 34 degrees; and

- Tyndale is using the protected term "seminary" in its name.

Therefore, I am assessing an administrative penalty of $173,000, consisting of 34 violations of granting a degree without authority at $5,000 each and one violation of using a protected term at $3,000.

You have twenty (20) days from the date of receipt of this letter to either pay the penalty or appeal the decision. . . .

Also, you must immediately cease your actions in violation of state law. You must contact us within twenty days of the receipt of this letter with your plans to correct your actions. At minimum those plans must include the following: you must (1) cease using the term "seminary," or any other protected term, in the name of your institution; (2) cease awarding or offering to award degrees; (3) cease offering credit towards degrees; (4) inform your graduates, students, and potential students by letter that you have no degree granting authority; and (5) offer by letter full refunds to all graduates and students. The content of the letter informing your students of your status and the offer of refunds must be submitted to the Coordinating Board for approval prior to its distribution. Failure to contact us with your plans to correct your actions will result in our referring this matter to the Office of the Attorney General for injunctive and any other relief allowed by law.

## C

Tyndale did not appeal the Board's decision.[46] Instead, HEB Ministries sued the Coordinating Board, the Commissioner, and the Attorney General for a declaratory judgment that sections 61.304[47] and 61.313(a), as applied to a school like Tyndale, violate the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution as well as article I, section 6 of the Texas Constitution.[48] HEB Ministries also sought attorney fees. The Coordinating Board and the Commissioner counterclaimed for collection of the previously assessed $173,000 administrative penalty, an injunction prohibiting HEB Ministries

46. *See* TEX. EDUC.CODE § 61.316(f) ("An institution may appeal an administrative penalty in the manner provided by Chapter 2001, Government Code.").

47. What was then section 61.304 is now section 61.304(a)-(c). *Supra* note 9.

48. The petition also alleged that the statutes violate article I, section 29 of the Texas Constitution ("To guard against transgressions of the high powers herein delegated, we declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void."), and that section 61.304 of the *Texas Education Code violates* due process guaranteed by the Fourteenth Amendment to the United States Constitution and article I, section 19 of the Texas Constitution. None of these claims is material to this appeal.

from engaging in the conduct for which it had been sanctioned, and attorney fees.

At some point, two other institutions intervened as plaintiffs. One, Southern Bible Institute, describes itself as "a post-secondary religious educational institution in Dallas, Texas ... founded for the purpose of preparing disadvantaged African–American men for the gospel ministry." The other, Hispanic Bible Institute, states that it is "a post-secondary religious educational institution in San Antonio, Texas", and that "[t]he educational offerings of this ministry are theology, church and pastoral ministry, and general studies." The record contains no other information about the intervenors.

Both sides moved for summary judgment. In their motion, the plaintiffs (including the intervenors) argued, in addition to the allegations in HEB Ministries' petition, that sections 61.304 and 61.313 also violate the First Amendment's Free Speech Clause[49] and article I, section 8 of the Texas Constitution.[50] The defendants did not object to this additional claim and addressed it in their response. The trial court held that section 61.313's regulation of the word "seminary" violates the First Amendment and article I, sections 6 and 8 of the Texas Constitution. In all other respects, the trial court granted summary judgment for the defendants. It ordered HEB Ministries to pay the State $170,000, the penalty assessed for granting 34 degrees, and ordered the plaintiffs to pay $34,781 in attorney fees. The court also enjoined HEB Ministries from awarding degrees, as defined in Subchapter G, or representing that Tyndale's educational credits would be applied toward a degree at another institution, until it obtained a certificate of authority from the Coordinating Board.

The court of appeals held that neither 61.304 nor 61.313 violates the First Amendment or article I, sections 6 and 8 of the Texas Constitution. Thus, it reinstated the $3,000 administrative penalty against HEB Ministries for Tyndale's use of "seminary", and upheld the $170,000 administrative penalty for granting degrees. The court remanded the case for entry of a permanent injunction consistent with its opinion.[51]

We granted the plaintiffs' petition for review.[52] Petitioners, to whom we shall refer collectively as "HEB Ministries", contend that the Establishment and Free Exercise Clauses of the First Amendment and corresponding state constitutional provisions preclude the State from requiring a post-secondary school with a religious mission to meet specified standards for its operation and curriculum before it can call itself a "seminary" or use words like "associate", "bachelor's", "master's", and "doctor's" to mark student attainment in religious education and training. HEB Ministries does not challenge the State's authority to impose such standards on secular institutions and on religious institutions offering a secular education. Nor does HEB Ministries contend that the State cannot regulate use of the word "degree". It contends only that the State

---

**49.** U.S. CONST. amend. I ("Congress shall make no law ... abridging the freedom of speech....").

**50.** TEX. CONST. art. I, § 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press....").

**51.** 114 S.W.3d 617 (Tex.App.-Austin 2003).

**52.** 48 Tex. Sup.Ct. J. 146 (Dec. 3, 2004).

cannot deny the use of such higher education terminology to religious schools that do not meet its standards. Respondents, the Coordinating Board and the Commissioner (collectively "the Coordinating Board"),[53] insist that sections 61.304 and 61.313(a) are constitutionally sound because they are part of a neutral law that is secular in purpose and generally applicable to all institutions of higher education, and that only incidentally impacts institutions offering religious instruction. The Coordinating Board argues that use of the statutorily restricted words is unimportant to the religious mission of a school like Tyndale when there are other words it can use to describe itself and its students' attainment.

HEB Ministries also contends that sections 61.304 and 61.313(a) violate the Free Speech Clause of the First Amendment and corresponding state constitutional provisions. The separate opinions find it necessary to reach this issue, but we do not.

## II

The Establishment Clause prohibits any "law respecting an establishment of religion".[54] Correspondingly, article I, section 6 of the Texas Constitution states that "no preference shall ever be given by law to any religious society".[55] We have referred to this provision and article I, section 7 as "Texas' equivalent of the Establishment Clause."[56] The parties do not argue that there is any difference in the application of these federal and state constitutional provisions to this case, and we will assume for present purposes that they are coextensive.[57]

■■■ Fundamentally, "[t]he 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another."[58] Since the government cannot determine what a church should be, it cannot determine the qualifications a cleric should have or

---

**53.** The Attorney General represents respondents but is no longer a party to the case.

**54.** U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion...."); *Cantwell v. Conn.*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) ("The fundamental concept of liberty embodied in [the Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment. The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws.").

**55.** TEX. CONST. art. I, § 6 ("[N]o preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.").

**56.** *Williams v. Lara*, 52 S.W.3d 171, 186 (Tex. 2001).

**57.** *In re Commitment of Fisher*, 164 S.W.3d 637, 645 (Tex.2005) ("Where, as here, the parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, we limit our analysis to the United States Constitution and assume that its concerns are congruent with those of the Texas Constitution."); *see also Tilton v. Marshall*, 925 S.W.2d 672, 677 n. 6 (Tex.1996) ("Because Tilton has not argued persuasively for a different application of the provisions of the First Amendment and Article I, Section 6 as they pertain to the free exercise of religion, we assume without deciding that the state and federal free exercise guarantees are coextensive with respect to his particular claims.").

**58.** *Everson v. Bd. of Educ.*, 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *accord Williams*, 52 S.W.3d at 186.

whether a particular person has them.[59] Likewise, the government cannot set standards for religious education or training.[60] As the United States Supreme Court said long ago in *Watson v. Jones*:

> The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine ... is unquestioned.[61]

That said, the Supreme Court has also written:

> A system of government that makes itself felt as pervasively as ours could hardly be expected never to cross paths with the church. In fact, our State and Federal Governments impose certain burdens upon, and impart certain benefits to, virtually all our activities, and religious activity is not an exception. The Court has enforced a scrupulous neutrality by the State, as among religions, and also as between religious and other activities, but a hermetic separation of the two is an impossibility it has never required....
>
> Neutrality is what is required. The State must confine itself to secular objectives, and neither advance nor impede religious activity.[62]

■ The Coordinating Board asserts that subchapter G meets this requirement of neutrality. Though the statute regulates religious education, it does so, the Board argues, only incidentally in pursuit of its secular objective of regulating all post-secondary educational institutions generally, irrespective of whether their programs are secular or religious. In the sense that subchapter G applies to institutions across the board, we agree that it is neutral; that is, it does not single out religious programs for special treatment. But the fact that subchapter G burdens all private post-secondary institutions does not lessen its significant, peculiar impact on religious institutions offering religious courses of study. Subchapter G requires a clear, public, instantly identifiable differentiation between a religious education that meets the Coordinating Board's standards and one that does not: only an institution that meets those standards may call itself a seminary and its graduates associates, bachelors, masters, doctors, and the like. But setting standards for a religious education is a religious exercise for which the State lacks not only authority but competence,[63] and those deficits are not erased simply because the State concurrently undertakes to do what it *is* able to do—set standards for secular educational programs. The State cannot avoid the constitutional impediments to setting substantive standards for religious education by mak-

**59.** *See Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929) ("[I]t is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them."); *see also Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (reversing a judgment reinstating a deposed bishop).

**60.** *See Lemon v. Kurtzman,* 403 U.S. 602, 625, 91 S.Ct. 2105 (1971) ("Under our system the choice has been made that government is to

be entirely excluded from the area of religious instruction and churches excluded from the affairs of government.").

**61.** 80 U.S. (13 Wall.) 679, 728–729, 20 L.Ed. 666 (1871).

**62.** *Roemer v. Bd. of Pub. Works,* 426 U.S. 736, 745–747, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (plurality opinion) (footnote omitted).

**63.** *See Lemon,* 403 U.S. at 625, 91 S.Ct. 2105 ("[G]overnment is to be entirely excluded from religious instruction").

ing the standards applicable to all educational institutions, secular and religious.[64]

Subchapter G expresses a preference for one manner of religious education over another. The religious school that chooses to educate in the manner of secular schools may use education terminology with the State's approval. Other religious schools cannot. The Coordinating Board's standards we have set out above, adopted as authorized by subchapter G, require "academic freedom" and faculty "independence" inconsistent with a doctrinal statement like Tyndale's that is at the core of its mission. Those standards set minimum faculty qualifications and require that one-fourth of the hours required for graduation from a baccalaureate program be in *each* of three groups: the humanities and fine arts, the social and behavioral sciences, and the natural sciences and mathematics. The standards also give the Board wide discretion to determine the adequacy of an institution's operations and curriculum. An accrediting agency's standards must be at least as comprehensive and rigorous for the agency to receive recognition by the Board. Such standards, prescribing as they do a detailed model for any institution offering postsecondary education, can hardly be said to impact religious institutions offering religious instruction incidentally. Subchapter G does not target religious institutions, but it directly and substantively impacts them by impeding their ability to describe themselves or their students' religious educational attainment.

HEB Ministries does not argue that the Coordinating Board's standards offend constitutional protections when applied to secular educational programs, even if pro-

vided by religious institutions, and we need not consider that issue. HEB Ministries argues only that it is constitutionally impermissible for the State to require an indication of its preference for one manner of religious education over another. HEB Ministries' course offerings are almost exclusively in religious subjects—162 out of 172—and the ten general education courses available are offered only to supplement religious training. HEB Ministries offers no secular program of study. Its academic awards are all in religious studies, and the only certificate in our record clearly denotes this by stating that it is given for satisfactory completion of a "course of Theological studies". It is one thing for the State to require that English majors in a baccalaureate program take science or math courses, that they be taught by professors with master's degrees from accredited institutions, and that professors have the freedom to teach that the works sometimes attributed to Shakespeare were really written by Edward de Vere, Christopher Marlowe, Francis Bacon, or Queen Elizabeth I. It is quite another for the State to require that a religious institution's baccalaureate-level education in religion include psychology courses, or that preaching or evangelism or missions be taught only by professors with master's degrees instead of practitioners from the field, or that a school's faculty have the freedom to teach that the Bible was not divinely inspired, contrary to the school's tenets of faith. As the United States Supreme Court has observed,

> training for religious professions and training for secular professions are not fungible. Training someone to lead a congregation is an essentially religious endeavor. Indeed, majoring in devo-

64. *See Roemer,* 426 U.S. at 747, 96 S.Ct. 2337 ("The State must confine itself to secular ob-

jectives . . . .") (plurality opinion).

tional theology is akin to a religious calling as well as an academic pursuit.[65]

The Coordinating Board acknowledges that the State cannot control religious education and training and insists that subchapter G does not do so. Compliance is voluntary. Any institution is free to choose to operate without a certificate of authority from the Coordinating Board or accreditation from a recognized agency as long as it does not use restricted terminology. But subchapter G cannot avoid the Establishment Clause merely because it allows institutions a degree of choice.[66] The issue is whether it operates to prefer one kind of religious instruction over another. By restricting the terminology a religious institution can use, the State signals its approval or disapproval of the institution's operation and curriculum as vividly as if it hung the state seal on the institution's front door. A "seminary" teaches religion the way the State of Texas approves. A program or award in religious studies described as being at an associate, bachelor's, master's, or doctor's level, or anything equivalent, has the State's approval. All others do not.

As Tyndale explained in its course catalog, views vary on how post-secondary religious instruction should be provided. For some, the secular education model is preferred, with programs structured like those of any liberal arts school, and accreditation, though expensive, is affordable. For others, religious instruction is more insular, steeped in the doctrine and experience of a specific faith, and limited resources practically preclude obtaining accreditation.[67] The Coordinating Board admits that subchapter G takes sides in this debate, but insists that subchapter G does so only incidentally as part of its overall regulation of private post-secondary education. We disagree that the State's expression of a preference for how religion should be taught can fairly be characterized as incidental. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." [68] The Texas Constitution expressly prohibits such a preference. By limiting the educational terminology a religious institution may use without the approval of the Coordinating Board, subchapter G prefers one course of religious instruction over another.

**65.** *Locke v. Davey*, 540 U.S. 712, 721, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004).

**66.** *Williams v. Lara*, 52 S.W.3d 171, 191–192 (Tex.2001) (rejecting the argument that a county's religious education program for jail inmates posed no Establishment Clause problems because participation was voluntary, citing, *inter alia, Engel v. Vitale*, 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (rejecting the same argument regarding a state prayer program for public school students)).

**67.** *See* Brief of Amicus Curiae Southwestern Baptist Theological Seminary at 1–2 ("Southwestern finds, however, that the rigors of these accreditation processes take considerable time and personnel away from its educational programs and mission. Southwestern understands that educational institutions that are small, financially struggling, or that serve the needs of a religious order falling outside what might be considered to be the mainstream of popular faiths or ideologies may not posses either the individual or financial resources to participate in the accreditation process. Southwestern recognizes that the religious teaching of these institutions may be substantially 'chilled' if the State of Texas is permitted to set and enforce accreditation standards against these institutions, prevent the institutions from calling themselves 'seminaries', or keep these institutions from conferring religious certifications upon their students.").

**68.** *Larson v. Valente*, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982).

The Coordinating Board argues that subchapter G's standards are no different than sanitation standards a state might set for churches butchering meat to religious specifications. A state in such circumstances need not interfere with religious beliefs and practices to ensure that food is minimally safe for human consumption, and it cannot interfere in religious requirements when health is no longer an issue. Thus, government standards for determining that food is not only safe but kosher— a religious requirement only partly concerned with health—would involve an impermissible state preference among religious views.[69] As one court has written, a law that allows a state agency to determine whether food is kosher impermissibly "take[s] sides in a religious matter," even if the purpose of the law is to prevent fraud in the marketing of food.[70] Subchapter G helps prevent harm to students by requiring that educational institutions be financially responsible[71] and candid about their operations.[72] But the State's legitimate concern for student safety does not authorize it to take sides in the religious debate over how religion should be taught by setting substantive standards for religious educational curriculum and process. We have upheld regulations protecting the health, safety, and well-being of students in daycare facilities.[73] Subchapter G is much different.

■ We think sections 61.304 and 61.313(a) clearly effectuate a state preference for one model of religious education over others, a preference that the Establishment Clause simply does not permit. We are mindful, however, that

[t]he Supreme Court has rejected any absolute approach in applying the Establishment Clause. At times it has relied on the principles enunciated in *Lemon v. Kurtzman*[74] ... to guide it through this "extraordinarily sensitive area of constitutional law." Under *Lemon*, a government practice is constitutional if: (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not excessively entangle the government with religion.[75]

In our view, the statutory provisions at issue do not pass this test.

There is nothing to suggest that either the Legislature in enacting subchapter G or the Coordinating Board in enforcing it intended any purpose other than the secular one of maintaining high standards for post-secondary education to protect legitimate institutions and their graduates and prevent public deception by "diploma mills", even though the distinct impact on

---

**69.** *See Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415 (2d Cir.2002); *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337 (4th Cir.1995); *Ran-Dav's County Kosher, Inc. v. N.J.*, 129 N.J. 141, 608 A.2d 1353 (1992); *but see National Foods, Inc. v. Rubin*, 727 F.Supp. 104, 109 (S.D.N.Y.1989) (upholding a prosecution of a defendant for violating a law governing kosher food where the state alleged that the defendant acted in bad faith); *Sossin Sys., Inc. v. Miami Beach*, 262 So.2d 28, 29–30 (Fla. 3rd DCA 1972).

**70.** *Commack*, 294 F.3d at 425.

**71.** 19 Tex. Admin. Code § 5.214(12)-(13) (1998); *accord* 19 Tex. Admin. Code § 7.7(5)-(6) (2007).

**72.** 19 Tex. Admin. Code § 5.214(16), (24) (1998); *accord* 19 Tex. Admin. Code § 7.7(18) (2007).

**73.** *State v. Corpus Christi People's Baptist Church, Inc.*, 683 S.W.2d 692, 695 (Tex.1984).

**74.** 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

**75.** *Williams v. Lara*, 52 S.W.3d 171, 189 (Tex. 2001) (footnote and citations omitted).

religious instruction is apparent. Nor can we say that *the* principal or primary effect of subchapter G is to advance or inhibit religion, although as we have explained at length, a substantial effect of the statute is to indicate the State's preference for post-secondary religious instruction that meets the Board's standards. But it is fair to say that *a* principal or primary effect is to advance religious education the State approves and inhibit what it does not. We think it beyond serious dispute that the statute clearly and excessively entangles the government in matters of religious instruction. The Board's standards, and those of recognized accrediting agencies, cannot be applied without a thorough, detailed, and repeated examination of an institution's operations and curriculum. Without such an examination, the Board could not determine, as it says it must, whether, for example, "[t]he character, education, and experience in higher education of the faculty shall be such as may reasonably ensure that the students will receive an education consistent with the objectives of the course or program of study." [76] This is but one of more than a score of standards the institution must meet to obtain approval and access to restricted terminology. And it must demonstrate its compliance every two years until

it obtains full accreditation from a recognized agency, which, as we have noted, is considered by the Coordinating Board to be at least as rigorous an exercise as compliance with the Board's standards.

It is true, as the Coordinating Board argues, that an institution may choose not to burden itself with state standards, but that option does not disentangle the State from religious matters. The choice, which every institution must make, determines whether the institution may use restricted terminology, indicating that its programs have state approval. It is this expression of approval or lack of approval of religious instruction that entangles the State in religion.

Several Justices of the Supreme Court have criticized the *Lemon* test,[77] and while we are not at liberty to take criticism for rejection, from our vantage point, the Court seems over time to have become "particularly attuned to whether the challenged government practice purposefully or effectively 'endorses' religion, an inquiry courts generally consider a component of the *Lemon* test's first and second parts." [78] As we have explained, subchapter G clearly expresses the State's endorsement of particular religious education

---

**76.** 19 TEX. ADMIN CODE § 5.214(a)(5) (1998); *accord* 19 TEX. ADMIN. CODE § 7.7(9) (2007).

**77.** *See, e.g., Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 319–320, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (Rehnquist, C.J., dissenting) (describing *Lemon's* "checkered career"); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398–399, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring); *County of Allegheny v. ACLU*, 492 U.S. 573, 655–56, 109 S.Ct. 3086 (1989) (Kennedy, J., concurring in part and dissenting in part); *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 346–349, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (O'Connor, J., concurring); *Committee for Pub. Educ. &*

*Religious Liberty v. Regan*, 444 U.S. 646, 671, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) (Stevens, J., dissenting); *Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 768, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (White, J., concurring).

**78.** *Williams v. Lara*, 52 S.W.3d 171, 190 (Tex. 2001) (citing *Allegheny*, 492 U.S. at 592, 109 S.Ct. 3086); *accord Lynch v. Donnelly*, 465 U.S. 668, 688–694, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); *Books v. City of Elkhart*, 235 F.3d 292, 304–305 (7th Cir.2000); *Brooks v. City of Oak Ridge*, 222 F.3d 259, 264 (6th Cir.2000); *Granzeier v. Middleton*, 173 F.3d 568, 572–573 (6th Cir.1999); *Cammack v. Waihee*, 932 F.2d 765, 773–780 (9th Cir.1991).

by allowing institutions that meet its standards to use restricted terminology. A "seminary" is a state-endorsed school, and a "bachelor's" diploma a state-endorsed award. The State's imprimatur is unmistakable.

We are aware of only one other court that has considered whether state regulation of postsecondary religious education conflicts with the Establishment Clause. In *New Jersey State Board of Higher Education v. Shelton College,* the New Jersey Supreme Court upheld that state's regulation against an Establishment Clause challenge.[79] But the school in that case, Shelton College, offered secular as well as religious programs, including elementary education, secondary education, English, history, business management, music education, and natural science.[80] And the court's reasoning illustrates the significant differences between the level of regulation involved in that case and this one:

> The Establishment Clause permits minor, unobtrusive state supervision of religiously oriented schools. Only excessive entanglement is proscribed. None of the education statutes or regulations here in question mandates "active involvement of the sovereign in religious activity." None authorizes state regulation of the *content* of an educational program. Nor does the regulatory scheme on its face require "comprehensive, discriminating and continuing state surveillance." Although the regulations in this area appear to be burdensome, especially as applied to a college of ap-

proximately 30 students, they explicitly call for flexibility in their administration so as to accommodate various institutions with diverse educational goals. Because Shelton College declined even to complete the licensing process, the allegation of excessive entanglement rests on speculation about the manner in which these statutes and regulations might be applied. Although one could imagine an unconstitutional application of this regulatory scheme, we are confident that the Board of Higher Education will pursue the least restrictive means to achieve the State's overriding concerns. Of course, should the Board exercise its discretion in a manner that unnecessarily intrudes into Shelton's religious affairs, the college would then be free to challenge the constitutionality of such action. At this juncture, however, we need not invalidate these statutes merely because they may be amenable to an unconstitutional application.[81]

Subchapter G's certification process is certainly not minor or unobtrusive; it is, the Coordinating Board insists, "comprehensive and rigorous".[82] The statute prohibits an institution from using common terminology if the sovereign is not actively involved in the institution's religious education. State examination extends to content and presentation. There is no special provision for religious instruction, and not only is the Board given no discretion to treat such education differently than secular education, it has given no indication that it would be willing to do so if it could.[83] We need not speculate what pro-

---

**79.** 90 N.J. 470, 448 A.2d 988 (1982).

**80.** *Id.* at 990.

**81.** *Id.* at 997–998 (footnote and citations omitted).

**82.** 19 Tex. Admin. Code § 5.213(i)(2) (1998); *accord* Tex. Admin. Code § 7.5(f)(2) (2007).

**83.** As the court of appeals noted, 114 S.W.3d at 623, 628, subchapter G authorizes the Coordinating Board to extend an institution's eligibility for certification if it has been denied accreditation based on its religious policies. Tex Educ.Code § 61.308(e) ("If, after a good-faith effort, an institution cannot achieve accreditation within the period of pro-

cess Tyndale would have been required to follow to obtain certification; the demands of the Board's standards are perfectly clear. These are not the circumstances described in *Shelton College*, and had they been, we think from what the court said there, it would have reached the same result we do in the present case.

■ "The purpose of the Establishment Clause is to protect against state 'sponsorship ... and active involvement' in religious activity." [84] Here, the religious activity is offering religious instruction and recognizing attainment with certificates clearly reflecting that such instruction is religious. We do not address what restrictions may be imposed on religious institutions that offer a secular education or award diplomas or other certificates for courses of study not clearly denominated as religious. It is hard to imagine a more active involvement in religious training than by determining whether it meets the comprehensive standards set by the Coordinating Board, and equally hard to imagine a more direct state sponsorship of religious education than by indicating in every institution's name and on every academic

award whether the State approves the programs of study. We therefore hold that sections 61.304 and 61.313(a) violate the Establishment Clause and article I, section 6 of the Texas Constitution as applied to a religious institution's programs of religious instruction.

## III

### A

The First Amendment also forbids any "law ... prohibiting the free exercise" of religion.[85] Likewise, article I, section 6 of the Texas Constitution states:

All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion.... [86]

We have treated the state and federal Free Exercise guarantees as coextensive

---

time prescribed by the board, the institution may appeal for extension of eligibility for certification because of having been denied accreditation due to policies of the institution based on religious beliefs or other good and sufficient cause as defined by rule of the board. The board shall consider the application of any accreditation standard that prohibited accreditation of the institution on the basis of religious policies practiced by the institution as a prima facie justification for extending the eligibility for certification if all other standards of the board are satisfied."). The court of appeals thought that this provision made subchapter G's supervision of religious schools "unobtrusive". 114 S.W.3d at 628. The Coordinating Board has not made that argument in its briefs in this Court and has not cited section 61.308(e), although it did cite a corresponding regulation, 19 Tex. Admin. Code § 7.6(c)(5) (2007), and pointed out in oral argument that because HEB Ministries has never been evaluated by the State,

there has never been an opportunity for "any court ... to see if there is indeed a conflict between any of [the State's] requirements and [HEB Ministries'] religious beliefs or practice." The Board stops short of saying that it would have—or even could have—offered any special allowances for religious institutions.

84. *State v. Corpus Christi People's Baptist Church, Inc.*, 683 S.W.2d 692, 694–695 (Tex. 1984) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)).

85. U.S. Const. amend. I ("Congress shall make no law ... prohibiting the free exercise of [religion]...."); *Cantwell v. Conn.*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

86. Tex. Const. art. I, § 6.

absent parties' argument to the contrary,[87] and we do so again here. We are well aware of scholarly commentary criticizing the United States Supreme Court's recent Free Exercise decisions,[88] but we do not find it necessary to discuss those issues in this case.

HEB Ministries contends, as we have said, that subchapter G violates its Free Exercise rights by requiring that it either comply with state standards, and thereby compromise its religious training mission, or forego the use of restricted terms, including "seminary" and common program-level designations for its diplomas. The Coordinating Board asserts that subchapter G does not violate the Free Exercise Clause because it is a neutral law of general applicability, or if not, then because the State has a compelling interest in regulating post-secondary schools. The Board stresses that compliance with subchapter G is voluntary and that other terms are available to schools that do not comply.

This dispute centers on whether and how to apply the United States Supreme Court's decision in *Employment Division v. Smith*.[89] In *Smith*, two Native American Church members who used peyote for sacramental purposes were fired and then denied unemployment benefits because their conduct violated state drug laws.[90]

They complained that the criminal law thus infringed on their Free Exercise rights. The Supreme Court disagreed, noting that it had "consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."[91] The only exceptions, it stated, had

> involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech .... And it is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns....
>
> The present case does not present such a hybrid situation, but a free exercise claim unconnected with any communicative activity.... Respondents urge us to hold, quite simply, that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation. We have never held that, and decline to do so now. There being no

---

**87.** *Tilton v. Marshall*, 925 S.W.2d 672, 677 n. 6 (Tex.1996) ("Because Tilton has not argued persuasively for a different application of the provisions of the First Amendment and Article I, Section 6 as they pertain to the free exercise of religion, we assume without deciding that the state and federal free exercise guarantees are coextensive with respect to his particular claims.").

**88.** *See, e.g.,* John Delaney, *Police Power Absolutism and Nullifying the Free Exercise Clause: A Critique of Oregon v. Smith,* 25 IND. L.REV. 71 (1991); Douglas Laycock, *Formal, Substantive, and Disaggregated Neutrality Toward Religion,* 39 DEPAUL L.REV. 993 (1990); Douglas Laycock, *The Supreme Court's Assault on*

*Free Exercise, and the Amicus Brief that Was Never Filed,* 8 J.L. & RELIGION 99 (1990); Ira C. Lupu, *Employment Division v. Smith and the Decline of Supreme Court–Centrism,* 1993 BYU L. REV. 259 (1993); Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision,* 57 U. CHI L.REV. 1109 (1990); Mark G. Yudof, *Religious Liberty in the Balance,* 47 SMU L. REV. 353 (1994).

**89.** 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

**90.** *Id.* at 874, 110 S.Ct. 1595.

**91.** *Id.* at 879, 110 S.Ct. 1595 (internal quotation marks omitted).

contention that Oregon's drug law represents an attempt to regulate religious beliefs [or] the communication of religious beliefs, ... the rule to which we have adhered ... plainly controls.[92]

The Court specifically noted that the case did not involve "the communication of religious beliefs" or "any communicative activity". The fact that the use of peyote was prohibited by a general criminal law was "critical".[93] In that situation, the state could not be held to showing a compelling interest to justify the law:

The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.[94]

Three years later, the Supreme Court expounded on *Smith's* neutrality and general applicability requirements in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*.[95] There, a church of the Santeria religion challenged city ordinances passed to prohibit it from sacrificing animals as part of its religious ritual.[96] The requirement that a law be neutral toward religion, the Court said, is basic: "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious rea-

sons."[97] Non-neutrality, the Court said, was indicated but not established by the ordinances' use of the words "sacrifice" and "ritual" because the words, though religious in origin, also have secular meanings.[98] But even if a law is neutral on its face, if its object "is to infringe upon or restrict practices because of their religious motivation, the law is not neutral".[99] The Court readily found that "suppression of the central element of the Santeria worship service was the object of the ordinances."[100] The requirement of general applicability, the Court explained, was based on "[t]he principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief."[101] The Court deemed that principle "essential to the protection of the rights guaranteed by the Free Exercise Clause."[102] Clearly, the Court found, the ordinances "pursue[d] the city's governmental interests only against conduct motivated by religious belief."[103] Having determined that the ordinances were neither neutral nor generally applicable, the Court concluded:

A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests. The compelling inter-

---

92. *Id.* at 881–882, 110 S.Ct. 1595.

93. *Id.* at 876, 110 S.Ct. 1595.

94. *Id.* at 885, 110 S.Ct. 1595 (internal quotation marks omitted).

95. 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

96. *Id.* at 524–528, 113 S.Ct. 2217.

97. *Id.* at 532, 113 S.Ct. 2217.

98. *Id.* at 534, 113 S.Ct. 2217.

99. *Id.* at 533, 113 S.Ct. 2217.

100. *Id.* at 534, 113 S.Ct. 2217.

101. *Id.* at 543, 113 S.Ct. 2217.

102. *Id.*

103. *Id.* at 545, 113 S.Ct. 2217.

est standard that we apply once a law fails to meet the *Smith* requirements is not watered down but really means what it says. A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases. It follows from what we have already said that these ordinances cannot withstand this scrutiny.[104]

Concurring separately, Justice Scalia, who wrote for the Court in *Smith*, explained further:

> The terms "neutrality" and "general applicability" are not to be found within the First Amendment itself, of course, but are used in [*Smith*] and earlier cases to describe those characteristics which cause a law that prohibits an activity a particular individual wishes to engage in for religious reasons nonetheless not to constitute a "law ... prohibiting the free exercise" of religion within the meaning of the First Amendment. In my view, the defect of lack of neutrality applies primarily to those laws that *by their terms* impose disabilities on the basis of religion *(e.g.,* a law excluding members of a certain sect from public benefits); whereas the defect of lack of general applicability applies primarily to those laws which, though neutral in their terms, through their design, construction, or enforcement target the practices of a particular religion for discriminatory treatment.[105]

Justice Souter also concurred separately, expressing his misgivings over *Smith*, decided before he arrived at the Supreme Court. "[T]he noncontroversial principle," he said, "expressed in *Smith* though established long before, [is] that the Free Exercise Clause is offended when prohibiting religious exercise results from a law that is not neutral or generally applicable."[106] But as he read *Smith*, he said, its significance "is not only in its statement that the Free Exercise Clause requires *no more than* 'neutrality' and 'general applicability,' but also in its adoption of a particular, narrow conception of free-exercise neutrality."[107] Justice Souter continued:

> our common notion of neutrality is broad enough to cover not merely what might be called formal neutrality, which as a free-exercise requirement would only bar laws with an object to discriminate against religion, but also what might be called substantive neutrality, which, in addition to demanding a secular object, would generally require government to accommodate religious differences by exempting religious practices from formally neutral laws. If the Free Exercise Clause secures only protection against deliberate discrimination, a formal requirement will exhaust the Clause's neutrality command; if the Free Exercise Clause, rather, safeguards a right to engage in religious activity free from unnecessary governmental interference, the Clause requires substantive, as well as formal, neutrality.[108]

104. *Lukumi*, 508 U.S. at 546, 113 S.Ct. 2217 (internal quotation marks, brackets, ellipses, and citation omitted).

105. *Id.* at 557, 113 S.Ct. 2217 (Scalia, J., concurring) (citations omitted).

106. *Id.* at 559–560, 113 S.Ct. 2217 (Souter, J., concurring).

107. *Id.* at 560, 113 S.Ct. 2217 (emphasis added).

108. *Id.* at 561–562, 113 S.Ct. 2217 (citation and footnote omitted).

To illustrate his concern, Justice Souter suggested:

> A secular law, applicable to all, that prohibits consumption of alcohol, for example, will affect members of religions that require the use of wine differently from members of other religions and nonbelievers, disproportionately burdening the practice of, say, Catholicism or Judaism. Without an exemption for sacramental wine, Prohibition may fail the test of religion neutrality.[109]

"The prohibition law in place earlier this century," he noted, "did in fact exempt 'wine for sacramental purposes.'"[110] Free Exercise protections, he concluded, extend beyond what he took to be the rule in *Smith*:

> Rather, we have said, "[o]ur cases have established that '[t]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden.'"[111]

Neither the Court nor Justice Scalia responded to Justice Souter's concerns.

*Lukumi* was an easy case—the Court was unanimous on the result—because the clear genesis and purpose of the ordinances was to restrict the church's sacramental animal sacrifices. As the Court summarized the case, "the laws in question were enacted by officials who did not understand, failed to perceive, or chose to ignore the fact that their official actions violated the Nation's essential commitment to religious freedom."[112] Though *Smith* also involved a law restricting a church's sacramental practice, its purpose was to prevent drug abuse generally and its enactment was completely unrelated to the church's practice. As Justice Blackmun observed in *Lukumi*, the case would have been much harder if the church had been requesting "an exemption from a generally applicable anticruelty law."[113] That hypothetical and Justice Souter's illustrate the difficulties in applying the rule in *Smith*.

HEB Ministries and amici curiae[114] argue the rule does not apply in this case because subchapter G directly interferes with a religious group's education and training of its ministers, activities that are specifically protected by the First Amendment. In support of this argument, amici

---

**109.** *Id.* at 561, 113 S.Ct. 2217 (footnote omitted); *cf. Smith*, 494 U.S. at 877, 110 S.Ct. 1595 (stating that the sacramental use of wine could not be prohibited, but not discussing whether regulation of wine use in general would be required to except sacramental use: "But the 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation. It would be true, we think (though no case of ours has involved the point), that a State would be 'prohibiting the free exercise [of religion]' if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display.").

**110.** *Lukumi*, 508 U.S. at 561 n. 2, 113 S.Ct. 2217.

**111.** *Id.* at 565, 113 S.Ct. 2217 (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 384–385, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990), and *Hernandez v. Comm'r*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)).

**112.** *Id.* at 524, 113 S.Ct. 2217.

**113.** *Id.* at 580, 113 S.Ct. 2217 (Blackmun, J., concurring in the judgment).

**114.** Brief of Baptist Joint Committee on Public Affairs and Christian Legal Society as Amici Curiae in Support of Petitioners 37–38 (by Prof. Douglas Laycock and Eric Cernyar).

cite a Supreme Court decision prior to *Smith* that prohibited a court from deciding whether a bishop deposed by his church should be reinstated[115] and state and federal decisions prohibiting suits against churches for employment discrimination.[116] But these cases address government interference in selection of the clergy, not in education and training. Subchapter G only obliquely affects religious groups' selection of their clergy. It may influence students' choices in seeking a religious course of study, but it does not prohibit a group from calling a minister who does not hold a "degree" from a "seminary" or otherwise limit a group's freedom to select whomever it chooses. While subchapter G's impact on religious education is direct and undeniable, the authorities cited shed little light on whether it infringes on Free Exercise rights. Assuming that government regulation of clergy selection is prohibited apart from *Smith,* which seems a safe assumption even though *Smith* is silent on the subject, we do not think subchapter G can be so characterized. And though, as we have noted above, the government cannot regulate religious education any more than clergy selection,[117] the argument here is that subchapter G's standards are not constitutionally infirm because they apply to graduate education generally. Thus, we decline the invitation to analyze the Free Exercise issues here apart from *Smith,*

although we reiterate that *Smith* made a point of noting that it did not involve "the communication of religious beliefs" or "any communicative activity", which is at the heart of the present case.

Accordingly, we turn to the matter of how *Smith* applies, first to section 61.313's limitation on the use of "seminary", and then to section 61.304's limitation on terms reflecting program-level educational attainment.

### B

Undoubtedly, a statute regulating the use of words like "church", "mosque", and "synagogue" by groups that do not meet state standards would not be a neutral law of general applicability permissible under *Smith* because the words' meanings are exclusively religious,[118] and a law regulating their use would thus target religion. The Supreme Court said as much in *Lukumi* when it concluded that regulation of "sacrifice" and "ritual" was consistent with but not conclusive of facial discrimination because those words did not refer exclusively to religious practices,[119] implying that if they had, it would have reached the opposite conclusion.

The meaning of "seminary" is also not exclusively religious. Its origin is secular and only metaphorically related to education. Derived from the Latin *semen,* meaning "seed", "seminary" once meant a

---

**115.** *Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

**116.** *Callahan v. First Congregational Church,* 441 Mass. 699, 808 N.E.2d 301 (2004); *EEOC v. Roman Catholic Diocese,* 213 F.3d 795, 800 & n. * (4th Cir.2000) (collecting cases); *Combs v. Cent. Tex. Annual Conf. of United Methodist Church,* 173 F.3d 343, 346–350 (5th Cir.1999); *EEOC v. Catholic Univ. of Am.,* 83 F.3d 455, 461–463 (D.C.Cir.1996); *Simpson v. Wells Lamont Corp.,* 494 F.2d 490 (5th Cir.

1974); *McClure v. Salvation Army,* 460 F.2d 553 (5th Cir.1972).

**117.** *Supra* note 60 (citing *Lemon v. Kurtzman,* 403 U.S. 602, 625, 91 S.Ct. 2105 (1971)) and accompanying text.

**118.** Webster's Third New International Dictionary 404, 1473, 2318 (1981)

**119.** *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 534, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

seedbed but later a school, where, figuratively speaking, seeds of knowledge are planted.[120] The sixteenth-century Council of Trent of the Roman Catholic Church gave seminaries a distinctly religious cast, compared to other educational institutions like colleges and universities which were also often religious schools, by adopting a "Method of establishing Seminaries for Clerics, and of educating the same therein".[121] But the Church's employment of the word did not co-opt its meaning. Eighteenth-century seminaries in the United States were understood to include both secular and religious schools.[122] And today, "seminary" is still defined as a school, not solely a religious school.[123]

Primarily, however, "seminary" is used to refer to a religious school. The Coordinating Board has not pointed us to a single secular seminary in Texas, or even in the United States, for that matter, either at present or in 1997 when the Legislature amended section 61.313 to include "seminary" with "college", "university", and other institutional names as restricted words.

That is not to say there are none at all, but the fact that they are rare describes the context in which the 1997 amendment was proposed and adopted.

So does a provision added to the Texas Constitution in 1876. Article I, section 7 prohibits appropriation of public funds for any "theological or religious seminary".[124] In 1908, we observed that "the adjectives 'theological or religious' *necessarily* give ["seminary"] the meaning of a place specifically for the preparation of men for the ministry, or at least, for the teaching of religious doctrines",[125] thereby suggesting that the word without the modifiers would not be clearly understood to mean a religious school. But two other aspects of the framers' phrasing are worth noting. They obviously recognized that "theological or religious" and "seminary" fit together, that it made sense to refer to seminaries as theological or religious because seminaries often were. And they appear to have thought it made more sense than referring to theological or religious colleges or uni-

120. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2064 (1981); 14 THE OXFORD ENGLISH DICTIONARY 956 (2d ed.1989).

121. THE CANONS AND DECREES OF THE SACRED AND OECUMENICAL COUNCIL OF TRENT 187–192 (J. Waterworth ed. & trans., London, Dolman, 1848), *available at* http://history.hanover.edu/texts/trent.html.

122. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 869 n. 1, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (Souter, J., dissenting) ("While some of these ['seminaries of learning' which would have been funded under a Virginia tax bill defeated in 1876] undoubtedly would have been religious in character, others would not have been, as a seminary was generally understood at the time to be 'any school, academy, college or university, in which young persons are instructed in the several branches of learning which may qualify them for their future employments.' " N. Webster, An American Dictionary of the English Language (1st ed. 1828); see also 14 The Oxford English Dic-

tionary 956 (2d ed.1989). Not surprisingly, then, scholars have generally agreed that the bill would have provided funding for nonreligious schools. See, *e.g.*, Laycock, "Nonpreferential" Aid to Religion: A False Claim About Original Intent, 27 Wm. & Mary L.Rev. 875, 897 and n. 108 (1986) ('Any taxpayer could refuse to designate a church, with undesignated church taxes going to a fund for schools.... The bill used the phrase 'seminaries of learning,' which almost certainly meant schools generally and not just schools for the training of ministers')").

123. *Supra* note 118; BLACK'S LAW DICTIONARY 1365 (7th ed.1999) (defining "seminary" simply as "an educational institution, such as a college, academy, or other school").

124. TEX. CONST. art. I, § 7.

125. *Church v. Bullock*, 104 Tex. 1, 109 S.W. 115, 117 (1908) (emphasis added).

versities, surely not because such institutions were nonexistent, but because the use of "seminary" alone fully achieved their purpose of banning "[a]ppropriations for sectarian purposes", as the caption stated. The framers' choice of words indicates their understanding that seminaries were distinctly, though not exclusively, religious schools.

That same understanding is reflected elsewhere in the Education Code. In 1989, the Legislature created a work-study program "to provide eligible, financially needy students with jobs, funded in part by the State of Texas".[126] Eligibility requirements are minimal,[127] but a person is specifically ineligible if he or she "(1) receives an athletic scholarship; or (2) is enrolled in a seminary or other program leading to ordination or licensure to preach for a religious sect or to be a member of a religious order." [128] These are narrow categories, obviously intended to exclude small groups of students. The Legislature did not exclude all seminary students from the program, but only those in a religious course of study, and among them, only the ones aspiring to religious service. The language thus suggests that not all seminary education is religious. But it also suggests that the one word "seminary" fully conveys the idea of religious education, leaving "other" to include any such programs in colleges, universities, and other institutions.

■ No legislative history explains the Legislature's intent in amending section 61.313 to add "seminary" to names institutions are restricted in using, but it must

have recognized that the amendment would ensure regulation of the kind of religious study and clerical training for which seminaries primarily are known. Indeed, it is hard to imagine that the Legislature had anything less specific in mind, given that the other additions to the list were specific names for medical and law schools. Although the amendment may not have been aimed at religious practices quite as squarely as the ordinances in *Lukumi*, its target was certainly smaller than the general public health protected by the statute in *Smith*.

The Coordinating Board argues that the amendment did not alter the fact that section 61.313 is neutral in its purposes of setting high standards for post-secondary education and prohibiting "diploma mills". Even if all seminaries were religiously affiliated, the Board contends, a seminary education is respected in the secular world and should meet the standards the public expects for graduate education. Furthermore, the Board notes, religious subjects can be taught in secular programs. Sacred texts may be studied as literature, religious history without belief in divine direction, even creeds without a profession of faith, and the same standards should apply as for other programs. But these arguments exaggerate HEB Ministries' contention in this case. HEB Ministries does not contend that secular education, whether provided by seminaries or other institutions, even in religious subjects, is beyond state regulation; it contends only that the State cannot regulate the religious

---

126. TEX. EDUC.CODE § 56.072.

127. *Id.* § 56.075(a) ("To be eligible for employment in the work-study program a person must: (1) be a Texas resident as defined by coordinating board rules; (2) be enrolled for at least one-half of a full course load and conform to an individual course of study in an eligible institution; (3) establish financial need in accordance with coordinating board procedures and rules; and (4) comply with other requirements adopted by the coordinating board under this subchapter.").

128. *Id.* § 56.075(b).

education and training of students as part of a religious mission.

The Coordinating Board insists that section 61.313 does not violate HEB Ministries' Free Exercise rights by restricting its use of a single word, "seminary", when others are available, like "Biblical Institute", "Academy", "Center", "School", "School of Religion", or "School of Theology". It is not clear that the Board's reading of the statute is correct. Section 61.313 restricts not only the use of a listed term but also "a term having a similar meaning".[129] If the meanings of "seminary", "school", and "school of religion" are not similar, then the meaning of "similar" is itself unclear. If the Board is wrong and section 61.313 restricts not only the use of "seminary" but any other word of related import, then the statute denies a religious school that does not meet state standards all access to names used by such schools. And if the Board is right, the statute nevertheless limits access to the name that, unlike all others available, distinctly describes religious schools. Either way, the statute, in its application to schools offering only religious instruction, targets religious practices, discriminating between those that comply with state standards from those that do not, and is not merely a neutral regulation of post-secondary education.

■ "[A] law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests."[130] We have found only one other state that regulates use of the word "seminary" as subchapter G does.[131] The Coordinating Board tells us: "The State has a strong interest in ensuring that 'seminaries' are in fact genuine places of study and academic learning." With respect to religious courses of study, we think the State has no such interest at all and is in fact incapable of determining what is "genuine" religious study and learning and what is not. The Board argues that to exclude seminaries from the State's regulation of post-secondary education would seriously undermine its effectiveness, but HEB Ministries does not argue for so broad an exclusion. It contends only that a school's religious programs need not meet state standards before it can call itself a seminary. None of the instances of diploma mills' fraud on the public cited by the Board involves such programs. In sum, the Board has failed to show that the State has any interest in restricting use of the word "seminary" by schools offering religious instruction, let alone an interest of the highest order.

Accordingly, we conclude that section 61.313's restriction on the use of the name "seminary" by schools offering only religious programs of study violates the Free Exercise guarantees of the First Amendment and the Texas Constitution.

## C

■ HEB Ministries does not challenge the State's authority to require that a private postsecondary educational institution meet prescribed standards before it can grant degrees, which is what section 61.304 does, but contends that section 61.302(1) defines "degree" so broadly that a noncompliant school is effectively left with no words to describe educational attainment. For religious study programs, HEB Ministries asserts, this pressure to comply with

129. TEX. EDUC.CODE § 61.313(a).

130. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

131. 15 PA. CONS.STAT. § 1303; 24 PA. CONS.STAT. §§ 6501, 6507, 6508.

subchapter G's standards governing a school's operation and curriculum content violates the Free Exercise Clause.

The first premise of HEB Ministries' constitutional complaint is correct. Section 61.302(1) casts a wide net, defining "degree" to include not only the designations "associate", "bachelor's", "master's", and "doctor's", but "their equivalents", as well as "any title or designation, mark, abbreviation, appellation, or series of letters or words ... which signifies, purports to [signify], or is generally taken to signify satisfactory completion of the requirements of all or part of a program of study leading to [a] ... degree *or its equivalent*."[132] The last clause forms a linguistic Möbius strip: a degree is not only anything that could possibly signify a degree, but also the equivalent of anything that could possibly signify a degree, which includes the equivalent of ..., and so on. The Coordinating Board suggests in its brief that the definition excludes four terms, "certificate", "advanced certificate", "diploma", and "higher diploma", but those exceptions are nowhere to be found in subchapter G or in the Board's regulations. The Board offers no explanation why they alone do not signify, do not purport to signify, and are not generally taken to signify a degree or its equivalents, and no explanation is apparent, especially in the context of this case. HEB Ministries was fined $30,000 for awarding two "certificates" and four "diplomas" in "Biblical Studies" because the Commissioner concluded that Tyndale alleged that completed courses could be applied toward a degree. HEB Ministries was fined another $10,000 for awarding two "diplomas" in "Christian Studies" because the Commissioner found that Tyndale would accept them for admission to more advanced study in what it called "master's" programs. Not one of these eight awards was called a "degree" or designated "associate", "bachelor's", "master's", or "doctor's" or otherwise seems to have signified a degree.

■■■■ We realize we must construe statutes to avoid constitutional problems when we can,[133] but we cannot create exceptions where none appears to exist. It is hardly surprising, of course, that "degree" is defined broadly; the purpose of subchapter G is to ensure compliance, not to provide a safe haven for noncompliant schools. Even if the definition of "degree" admits exceptions, the use of any words remotely resembling ordinary educational terminology is risky. A violation of section 61.304 carries criminal, civil, and administrative liability.[134] If Subchapter G does not actually restrict all terminology ordinarily used to mark educational attainment, it effectively does so.

The second premise of HEB Ministries' complaint is also correct: section 61.304's prohibition against granting degrees, defined to include all useful terminology, strongly encourages, to the point of coercion, compliance with standards set by the Coordinating Board. Again, this is hardly surprising. Subchapter G is designed to ensure that private post-secondary schools operating in Texas meet prescribed standards. If it were easier for a school not to comply, the statute's effectiveness would be impaired. The Board insists that compliance is voluntary, by which it means that it is possible for a school to refuse, but the consequences of refusal are severe.

---

**132.** Tex. Educ.Code § 61.302(1) (emphasis added).

**133.** *E.g., In re Green,* 221 S.W.3d 645, 649 (Tex.2007) (per curiam) ("We must of course avoid a construction of a statute that renders it unconstitutional. *See* Tex. Gov't Code § 311.021(1).").

**134.** *Supra* notes 36–41.

We come, then, to the issue of whether this state regulation of the terminology used in recognizing student attainment, as applied to religious educational programs, violates the Free Exercise Clause. The Coordinating Board argues that because the regulation does not target religious programs, but applies to secular and religious programs alike, it is a neutral law of general applicability that, according to the rule in *Smith,* does not impact Free Exercise rights. This argument, we think, focuses too narrowly on the concepts of neutrality and general applicability, separate from the First Amendment's concerns they are meant to help analyze, and reduces them to a rule that a regulation is permitted as long as it is universal. Justice Souter's hypothetical involving Prohibition and the Eucharist illustrates the fallacy in such a rule.[135] A law is not neutral or generally applicable for purposes of applying the Free Exercise Clause merely because it affects everyone; it is important how religion is affected differently because it is religion. This concern is critical when the law affects communication, as the Supreme Court plainly implied in *Smith* by reemphasizing that the law there had no such effect.[136]

Standards for the content of educational instruction are not neutral with regard to religious studies merely because they also apply to secular studies, as the standards under subchapter G plainly show. Academic freedom, for example, which the Coordinating Board's standards require, has no more than a limited role, and perhaps no place at all, in a school whose mission is to advance the doctrinal tenets of a specific faith. Study in general subjects outside a student's major, a desirable requirement for a liberal arts education, may be considered a distraction or worse by someone preparing for the ministry or other religious service. These are but two examples. A secular educator's meat may be a religious educator's poison, and vice versa. Standards that improve the quality of secular education while impairing sectarian education discriminate against religion. The Coordinating Board argues that its standards benefit religious education, but that is a judgment call the First Amendment does not permit the State to make.[137] In any event, the Board argues, the intent is to benefit all educational programs. But while we can easily assume this to be true, we must also consider the effect of the standards on schools like Tyndale with a religious mission. The Board argues that section 61.304 regulates only the granting of degrees, something that is well within the State's authority, not how religious subjects are taught. But the statute's prohibition on granting degrees is so pervasive that its effect is necessarily coercive, as indeed it is intended to be.

In the sense that section 61.304 is directed to a problem, diploma abuse, that did not originate in or have any distinct association with any religious practice, the statute more closely resembles the drug law upheld in *Smith* than the animal sacrifice ordinances struck down in *Lukumi.* But section 61.304 strongly encourages compliance with state educational standards, which in turn affect the content and operation of religious educational programs, and in that sense, the statute not only differs from the laws in both cases, it affects "the

**135.** *Supra* notes 107–108 (citing *Lukumi,* 508 U.S. at 561, 113 S.Ct. 2217) and accompanying text.

**136.** *Supra* note 91 (citing *Employment Div. v. Smith,* 494 U.S. 872, 881–882, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)) and accompanying text.

**137.** *See Lemon v. Kurtzman,* 403 U.S. 602, 625, 91 S.Ct. 2105 (1971).

communication of religious beliefs" against which *Smith* pointedly warned.[138] We therefore conclude that the Free Exercise Clause requires that it "must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." [139]

"The compelling interest standard that we apply once a law fails to meet the *Smith* requirements is not 'water[ed] ... down' but 'really means what it says.' " [140] The Legislature has identified the State's interests as "prevent[ing] deception of the public resulting from the conferring and use of fraudulent or substandard college and university degrees", "regulation by law of the evidences of college and university educational attainment", and "protection of legitimate institutions and of those holding degrees from them".[141] Amici curiae argue that these interests are hardly compelling when the public can easily protect itself with relatively simple inquiries into the credentials of an educational institution and its graduates. But the Coordinating Board insists that "[d]egree mills continue to be a serious worldwide problem." [142] The Board points to various articles and studies chronicling instances of harm caused by bogus academic credentials. The stipulated record on which this case was submitted in the trial court contains no evidence regarding the importance of the State's interests in subchapter G.

We do not doubt the importance of the State's interests, but we nevertheless conclude that section 61.304 is not narrowly tailored to pursue those interests and avoid unnecessary interference with religious studies. The Board has not identified any instance of diploma fraud involving religious programs, or any complaint that an award of a diploma in religious studies did not represent the expected academic achievement. Thus, it is not clear that the purpose of subchapter G would be impaired in any way if religious programs were exempted altogether. At the very least, section 61.304's restrictions on all terminology relating to degrees need not be so pervasive for religious programs. The Board worries that any exception for religious schools might violate the Establishment Clause, but HEB Ministries does not argue that religious institutions offering secular education programs should be exempt from state standards. Amici argue that the State's interest would be fully served by requiring noncompliant institutions to disclose their lack of accreditation, even on academic award certificates. The Board does not argue that this, too, would raise First Amendment concerns but asserts only that it would be ineffective. It has not, however, provided support for its assertion.

The Board cites cases by the supreme courts of New Jersey and Tennessee upholding state regulation of graduate schools against challenges by religious institutions. In the New Jersey case, *Shelton College*, which we have already discussed, a religious school that offered both secular and religious instruction argued that state regulation of religious schools violated the First Amendment.[143] The

---

**138.** *Supra* note 91 (citing *Smith*, 494 U.S. at 881–882, 110 S.Ct. 1595) and accompanying text.

**139.** *Lukumi*, 508 U.S. at 546, 113 S.Ct. 2217 (internal quotation marks, brackets, ellipses, and citation omitted).

**140.** *Id.* at 546, 113 S.Ct. 2217 (quoting *Smith*, 494 U.S. at 888, 110 S.Ct. 1595).

**141.** Tex. Educ.Code § 61.301.

**142.** Brief for Respondents 4.

**143.** *New Jersey State Bd. of Higher Educ. v. Shelton Coll.*, 448 A.2d 988, 989–991 (N.J. 1982).

court held that the Free Exercise Clause did not require a blanket exemption of religious schools from state regulation.[144] But as we have said, the regulation was not as pervasive as subchapter G, and Shelton College did not limit its argument to its religious programs. In *Tennessee ex rel. McLemore v. Clarksville School of Theology*, the Tennessee Supreme Court upheld broad state regulation of a theological school that trained only ministers, offered no secular courses, and granted only theological degrees.[145] We respectfully disagree with that court's decision.

Finally, in an opinion the Board does not cite, the Texas Attorney General addressed whether subchapter G would violate the Free Exercise Clause as applied to a "university" that offered only religious instruction.[146] Relying heavily on the *Shelton College* decision, and without expressing a view on whether the statute burdened Free Exercise rights, the opinion concluded that "a court would conclude that [subchapter G] and the regulations adopted thereunder by the Coordinating Board, as a general matter are the least restrictive means of achieving the state's interest in maintaining the integrity of the postsecondary degrees and protecting its citizens from fraud and misleading representations."[147] We respectfully disagree.[148]

Accordingly, we conclude that section 61.304's restriction on the words that a religious institution may use to refer to

completion of religious programs of study is so broad that it violates the Free Exercise guarantees of the First Amendment and the Texas Constitution. The State may not deny a religious program of study clearly denominated as such the use of all words capable of describing educational achievement. As we have said, HEB Ministries does not complain of the statute's restriction on the use of the word "degree", and we do not consider whether it is permissible.

\* \* \*

The judgment of the court of appeals is reversed and the case is remanded to the trial court to vacate its injunction and award of penalties, to consider HEB Ministries' application for attorney fees,[149] and for further proceedings in accordance with this opinion.

Justice WAINWRIGHT filed an opinion concurring in part and dissenting in part, and concurring in the judgment, in which Justice JOHNSON joined.

Chief Justice JEFFERSON filed an opinion concurring in part and dissenting in part, in which Justice GREEN joined.

Justice WILLETT took no part in the decision of the case.

Chief Justice JEFFERSON, joined by Justice GREEN, concurring in part and dissenting in part.

The Board imposed a civil penalty against Tyndale for illegally issuing thirty-

**144.** *Id.* at 989, 996–997.

**145.** 636 S.W.2d 706, 707–708, 711 (Tenn. 1982).

**146.** Op. Tex. Att'y Gen. No. JC–0200 (2000).

**147.** *Id.*

**148.** *See, e.g., Commissioners Court of Titus County v. Agan*, 940 S.W.2d 77, 82 (Tex.1997)

("While Attorney General's opinions are persuasive they are not controlling on the courts.").

**149.** *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex.1994) (stating that "by authorizing declaratory judgment actions to construe the legislative enactments of governmental entities and authorizing awards of attorney fees, the [Declaratory Judgment Act] necessarily waives governmental immunity for such awards").

four degrees. Tyndale chose not to appeal that administrative penalty or the Board's findings. Instead, HEB Ministries and two unrelated entities—Southern Bible Institute and Hispanic Bible Institute—launched a facial constitutional attack on portions of the Education Code. Specifically, HEB Ministries and its co-plaintiffs sought a declaration that sections 61.302(1) and 61.304 of the Education Code violated rights guaranteed by the Due Process, Free Speech, Establishment, and Free Exercise clauses of both the United States and Texas constitutions. Both the trial court and the court of appeals concluded that the statute regulating the issuance of degrees did not violate HEB Ministries' constitutional rights. Today, however, a majority of the Court—for differing reasons—concludes otherwise. Because the statute does not unconstitutionally impinge on HEB Ministries' freedom of speech or rights guaranteed by the Establishment Clause and the Free Exercise Clause, I respectfully dissent. I agree with the Court that section 61.313's restriction on the use of the name "seminary" by schools offering only religious programs of study violates the Free Exercise Clause, and I concur in that portion of the Court's judgment.[1]

# I

## Establishment Clause

I agree with JUSTICE WAINWRIGHT that this case is more appropriately analyzed under the Free Exercise Clause than the Establishment Clause. The Establishment Clause forbids any "law respecting an establishment of religion." U.S. CONST. amend. I. In *State v. Corpus*

*Christi People's Baptist Church, Inc.*, 683 S.W.2d 692, 695 (Tex.1984), we held that an establishment clause challenge to a statute permitting state licensing and regulation of child-care facilities, as applied to church-operated facilities, was "misplaced." We observed:

The Establishment Clause cases address the issue of whether some form of government *aid,* either direct or indirect, to a religious institution violates the Establishment Clause.

Unlike the traditional Establishment Clause cases, this case involves government *regulation* of a child-care institution which is part of the church ministry. This distinction is important for two reasons. First, to accept [the church's] argument and invalidate the licensing and regulatory scheme because of "excessive entanglements" would create a dilemma in applying the three-pronged Establishment Clause test; the second prong would be at odds with the third. Requiring nonreligious childcare facilities to comply with the state licensing and regulatory scheme while exempting religious facilities would result in unequal state treatment of the two classes of institutions. This unequal treatment could, arguably, be impermissible under the second-prong of the Establishment Clause test because the primary effect would be to advance religion.

Second, state licensing and regulation is a type of entanglement that differs from the entanglement discussed in the traditional Establishment Clause cases. In those cases, the State must examine and determine what programs are religious and what programs are secular to

---

1. I join most of part III–B of the Court's opinion, but I do not agree with its proposition that "[e]ither way, the statute in its application to schools offering only religious instruction targets religious practices, dis-

criminating between those that comply with state standards from those that do not, and is not merely a neutral regulation of postsecondary education."

ensure that government aid reaches only the nonreligious ones. In our case, the state regulatory scheme prohibits inquiry into the religious content of the homes' curriculum. The purpose of these regulations is to assure that all child-care facilities, secular and nonsecular, meet certain minimum standards in areas such as financial solvency, staff-child ratio, nutrition and medical care.

*People's Baptist Church,* 683 S.W.2d at 695 (citations omitted). We concluded that the licensing requirement did not offend the Establishment Clause and noted that "[a] more appropriate and direct means of questioning the constitutionality of this government regulation is through ... the Free Exercise Clause." *Id.* at 695.

Such is the case here. As in *People's Baptist,* requiring nonreligious higher-education institutes to comply with the accreditation scheme while exempting religious institutions would result in unequal treatment of the two, an impermissible advancement of religion under the second prong of the *Lemon* test. *Id.; cf. Cutter v. Wilkinson,* 544 U.S. 709, 722, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)(noting that "an accommodation [for religious observance] must be measured so that it does not override other significant interests"); *Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, 396–97, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) (noting the irony that exempting religious activities from tax, as plaintiffs requested, would require the state to engage in the arguably impermissible task of determining which expenditures were religious and which were secular). Moreover, this case involves state regulation, not aid. The regulatory oversight at issue here is designed to ensure that all educational institutions—religious and secular alike—comport with minimum educational standards for issuing degrees. Subchapter G governs a secular matter: the creation of a system that recognizes

certain types of post-secondary educational achievement. Accreditation signals not the approval of the school's message, but a certification that the institution meets a variety of educational standards, and any institution—religious or otherwise—may apply for authorization to issue degrees. Accordingly, as in *People's Baptist,* a "more appropriate and direct means of challenging the constitutionality" of this regulation is through the Free Exercise Clause. *People's Baptist,* 683 S.W.2d at 695.

Even if the Establishment Clause were implicated, however, the statutory scheme here passes muster.

Under *Lemon,* a government practice is constitutional if: (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not excessively entangle the government with religion.

*Williams v. Lara,* 52 S.W.3d 171, 189 (Tex. 2001). The plurality concedes that the accrediting statute has a secular purpose and that its primary effect neither advances nor inhibits religion. Instead, the plurality concludes that it is "beyond serious dispute that the statute clearly and excessively entangles the government in matters of religious instruction." 235 S.W.3d at 647.

In *Agostini v. Felton,* the Supreme Court noted that Lemon's "excessive entanglement" prong was more properly analyzed as a subset of the second prong: whether the regulation's primary effect advanced or inhibited religion. *Agostini,* 521 U.S. 203, 232–33, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). The Court also noted that "[n]ot all entanglements, of course, have the effect of advancing or inhibiting religion," and that because "[i]nteraction between church and state is inevitable, ... [e]ntanglement must be 'excessive' before

it runs afoul of the Establishment Clause." *Id.* at 233, 117 S.Ct. 1997.

At least one state court has explored the contours of this inevitable interaction between church and state in a context similar to ours. As the plurality notes (and respectfully disagrees with), the Tennessee Supreme Court upheld broad state regulation of a religious school that issued only religious degrees. *State v. Clarksville School of Theology,* 636 S.W.2d 706, 711 (Tenn.1982). The court's reasoning is instructive:

> [The Tennessee statute] places neither a direct nor indirect burden upon the free exercise of religion by the defendants nor threatens an entanglement between the affairs of church and state.... [T]he Act does not regulate the beliefs, practices or teachings of any institution; it merely sets forth minimum standards which must be met in order for an institution to be authorized to issue degrees. Moreover, the evidence shows that the granting of degrees is a purely secular activity. It is only this activity that brings the School under the regulation of the Act.
>
> . . .
>
> The School can choose to not comply with the Act and yet may continue to train ministers as it chooses; such noncompliance with the Act will simply prohibit the School from granting degrees.

*Id.* at 709; *see also N.J. State Bd. of Higher Educ. v. Bd. of Dirs. of Shelton College,* 90 N.J. 470, 448 A.2d 988, 997–998 (1982) (rejecting Establishment Clause challenge to a statute regulating post-secondary education, as there was no excessive entanglement between church and state).

Similarly, the regulations here, while comprehensive, are entirely voluntary and do not purport to interfere with the parochial mission of any school. *See, e.g., Roemer v. Md. Public Works Bd.,* 426 U.S. 736, 764, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (plurality op.) (determining that contacts between state and colleges for purposes of administering aid program "are not likely to be any more entangling than the inspections and audits incident to the normal process of the colleges' accreditations by the State"). The plurality contends that "[t]here is no special provision for religious instruction, and not only is the Board given no discretion to treat such education differently than secular education, it has given no indication that it would be willing to do so if it could." 235 S.W.3d at 648. But the statute, as well as the Coordinating Board's accompanying regulations, expressly permit religious institutions to be certified without meeting the standard qualifications for accreditation. Section 61.308(e) provides:

> If, after a good-faith effort, an institution cannot achieve accreditation within the period of time prescribed by the board, the institution may appeal for extension of eligibility for certification because of having been denied accreditation *due to policies of the institution based on religious beliefs* or other good and sufficient cause as defined by the board. *The board shall consider the application of any accreditation standard that prohibited accreditation of the institution on the basis of religious policies practiced by the institution as a prima facie justification for extending the eligibility for certification if all other standards of the board are satisfied.*

TEX. EDUC.CODE § 61.308(e) (emphasis added).[2] During the relevant time, the pertinent regulations provided:

> holding that this provision rendered the statutory scheme "unobtrusive." 235 S.W.3d at

---

**2.** In a footnote, the plurality cites section 61.308(e) and notes the court of appeals'

If the board determines that an institution has been unable to achieve accreditation by a recognized agency *on the basis of religious policies practiced by the institution*, the board will consider the institution eligible to apply for a certificate of authority, provided that all other standards are met at the level of accreditation and that *such religious institutions shall be eligible to grant degrees of a religious nature only.*

19 TEX. ADMIN. CODE § 5.215(d)(4) (2003).[3] That Tyndale has "steadfastly refused," 114 S.W.3d at 630, to participate in any of these alternate processes does not make them any less available, and we should not invalidate the statutes "merely because they may be amenable to an unconstitutional application." *Shelton College*, 448 A.2d at 998; *see also Roemer*, 426 U.S. at 761, 96 S.Ct. 2337 (noting that "[i]t has not been the Court's practice, in considering facial challenges to statutes of this kind, to strike them down in anticipation that particular applications may result in unconstitutional [actions]").

The plurality concludes that the State's regulations on degree-granting violate the Establishment Clause because allowing some religious institutions (those that meet accreditation requirements) to grant degrees while forbidding others to do so "clearly effectuate[s] a state preference for one model of religious education over others, a preference that the Establishment Clause does not permit." 235 S.W.3d at 646. The plurality asserts that "[i]t is hard to imagine a more active involvement in religious training than by determining whether it meets the comprehensive standards set by the Coordinating Board, and *equally hard to imagine a more direct state sponsorship of religious education than by indicating in every institution's name and on every academic award whether the State approves the programs of study*." *Id.* at 649 (emphasis added). If this is indeed the case, the logical implication is that the State cannot accredit *any* religious colleges or universities that offer degrees in *any* religious discipline,[4] as such accreditation would also appear to run afoul of the Establishment Clause as an impermissible preference under the

649. The plurality brushes this section aside because "[t]he Coordinating Board has not made that argument in its briefs in this Court, and has not cited section 61.308(e), although it did cite a corresponding regulation . . . and pointed out in oral argument that because HEB Ministries has never been evaluated by the State, there has never been an opportunity for 'any court . . . to see if there is indeed a conflict between any of [the State's] requirements and [HEB Ministries'] religious beliefs or practice.'" The plurality also notes that "[t]he Board stops short of saying that it would have—or even could have—offered any special allowances for religious institutions." Regardless of the Coordinating Board's contentions or citations, we may no more ignore this exemption for religious institutions than we may disregard unmentioned, but controlling, precedent.

3. The current regulations contain a similar provision:

> The Board shall consider the application of any accreditation standard that prohibits accreditation of an institution solely on the basis of religious policies practiced by the institution as sufficient justification for extending the institution's eligibility for certification to grant degrees of a religious nature only, if the institution:
> (A) has applied for and pursued accreditation in good faith;
> (B) meets all other standards at the level of accreditation; and
> (C) satisfies all other requirements of the Board.

19 TEX. ADMIN. CODE § 7.6(c)(5) (2007).

4. As Respondents assert, "[i]f these statutes are held to violate the Establishment Clause, a blanket exemption would be required for all religious institutions."

plurality's analysis. Nor, it seems to me, could the State regulate or license religious institutions operating in other spheres, *e.g.,* church-affiliated broadcasting stations. Further, the plurality's analysis would seem to apply to invalidate state regulation of marriage or adoption, if that regulation was inconsistent with the tenets of a particular religion. The state can regulate in these areas, as I believe it can regulate the issuance of degrees, because allowing religious institutions to participate in secular regulatory schemes simply does not violate the Establishment Clause.

The Supreme Court rejected a similar argument in *Bob Jones University v. United States,* a case in which Bob Jones University contended, among other arguments, that denying it a tax exemption violated the Establishment Clause by preferring religions whose tenets did not require racial discrimination over those that believed racial intermixing was forbidden. *Bob Jones,* 461 U.S. 574, 604 n. 30, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). The Court held that:

> [i]t is well settled that neither a state nor the Federal Government may pass laws which prefer one religion over another, but it is equally true that a regulation does not violate the Establishment Clause merely because it happens to coincide or harmonize with the tenets of some or all religions. The IRS policy at issue here is founded on a neutral, secular basis, and does not violate the Establishment Clause. In addition, ... the uniform application of the rule to all religiously operated schools avoids the necessity for a potentially entangling inquiry into whether a racially restrictive practice is the result of a sincere religious belief.

Id. at 604–05, 103 S.Ct. 2017 (citations and internal quotations omitted). I agree with that analysis and would hold that subchapter G, similarly, is founded on a neutral, secular basis and does not violate the Establishment Clause.

## II

### Free Exercise Clause

I also agree with JUSTICE WAINWRIGHT that subchapter G does not violate the Free Exercise clause. Indeed, the plurality's extended analysis is inappropriate because HEB Ministries does not maintain that the conduct in which it is prohibited from engaging (the issuance of degrees and similar documents) is religiously motivated. As the Supreme Court explained in *United States v. Lee,* the "preliminary inquiry in determining the existence of a constitutionally required exemption" from a neutral law of general application under the Free Exercise Clause is whether compliance with the law "violates [the challengers'] religious beliefs" and thus "interferes with their free exercise rights." *United States v. Lee,* 455 U.S. 252, 256–257, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). The cases cited by the plurality affirm this rule. In *Employment Division v. Smith,* the law at issue forbade the religiously motivated use of peyote;[5] *in Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*[6] the law prohibited the ritual sacrifice of animals demanded by the Santeria religion; even in *Shelton,* the New Jersey Supreme Court case, the plaintiff college alleged that state accreditation was inconsistent with the Bible's command that it reject state licensure.[7]

By contrast here, HEB Ministries is not claiming that accreditation violates any re-

---

**5.** 494 U.S. 872, 110 S.Ct. 1595(1990).

**6.** 508 U.S. 520, 113 S.Ct. 2217 (1993)

**7.** *Shelton College,* 448 A.2d at 993.

ligious principles. HEB Ministries does not contend that its religious tenets require its graduates to hold documents the general public would likely confuse with degrees granted by accredited colleges. HEB Ministries does not allege that there is any religious significance to "degree," "bachelor's," or similar terms. Moreover, the State has not prohibited Tyndale from describing accurately its graduates' achievements. To give but one example, subchapter G would not prohibit a religious institution from issuing a document certifying that "John Doe has completed an advanced course of study in X and is qualified to minister in Y church."

Even assuming that a prohibition on the issuance of degrees (or similarly worded documents) violated HEB Ministries' religious beliefs, its Free Exercise claims would fail because the Coordinating Board would maintain the right to ensure educational standards. As Justice Scalia, writing for the Court, noted in *Employment Division v. Smith*, the Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Smith*, 494 U.S. 872, 878–79, 110 S.Ct. 1595 (1990).[8] The only exceptions to this rule "have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections," such as the protection

of freedom of speech. *Id.* at 881, 110 S.Ct. 1595.

Thus, in order to arrive at the conclusion that subchapter G violates the Free Exercise Clause, the plurality engages in a strained reading of the record and the case law—characterizing the statute as restricting "the communication of religious beliefs" such that the State must have a compelling interest and must tailor its accreditation scheme narrowly. The plurality would implement this heightened scrutiny when "the law *affects* communication." 235 S.W.3d at 659 (emphasis added). But the *Smith* Court used the word "regulate" in discussing this line of cases,[9] and a careful examination of precedent reveals a much higher level of state involvement necessary to implicate the freedom of speech analysis. The examples of "hybrid" freedom of speech and Free Exercise decisions cited in *Smith* involved a discretionary licensing system for religious solicitation, requiring the State to determine whether a given cause was religious[10] and a flat tax on solicitation as applied to dissemination of religious ideas.[11]

The regulations that were struck down under a "hybrid" analysis directly limited religious communication. In contrast, Tyndale and similar institutions are free under subchapter G to say and teach whatever they wish without government involvement—they are merely barred from

---

**8.** Here, as JUSTICE WAINWRIGHT notes, there is no doubt that the State is free to regulate postsecondary education, and thus may regulate the issuance of degrees (and degree-like documents) even by those who are religiously impelled to issue them.

**9.** *Smith*, 494 U.S. at 882, 110 S.Ct. 1595("There being no contention that Oregon's drug law represents an attempt to regulate ... the communication of religious beliefs ...").

**10.** *Cantwell v. Connecticut*, 310 U.S. 296, 304–307, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

**11.** *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Follett v. McCormick*, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944); *see also Swaggart*, 493 U.S. at 387, 110 S.Ct. 688 (discussing *Murdock* and *Follett* and observing that "[s]ignificantly, we noted in both cases that a primary vice of the ordinances at issue was that they operated as prior restraints of constitutionally protected conduct.").

issuing a degree misrepresenting the nature of the education they choose to provide. Despite assertions to the contrary,[12] subchapter G cannot fairly be construed as so pervasively, or even substantially, affecting communications as to trigger strict scrutiny, and, thus, even if HEB Ministries' conduct were religiously motivated, subchapter G would not violate the Free Exercise Clause.

## III

### Free Speech

I disagree with JUSTICE WAINWRIGHT'S contention, however, that the State may only regulate "degrees" and not associated terminology like the terms "associate," "bachelor's," "master's," and "doctorate."[13] JUSTICE WAINWRIGHT would hold that the State may regulate a single word—degree—and that all other regulations violate the United States Constitution. This distinction overlooks the significance of the terminology used to connote educational achievement. Words like "bachelor's," "master's", and "doctorate" have acquired meanings that permit them to stand on their own, even absent the noun—"degree"—they are generally understood to modify. When these absolute adjectives [14]

are used as marks of educational attainment, they represent the conferment of "degrees" and permit, as here, an unaccredited institution's graduates to overstate their credentials.

Additionally, JUSTICE WAINWRIGHT'S concurrence goes beyond the protections HEB Ministries itself sought. HEB Ministries has conceded that diplomas in secular disciplines are subject to state regulation. It asserts only that diplomas awarded in religious disciplines are exempt. But if the statute violated the First Amendment's free speech guarantee, any post-secondary institution— whether religiously affiliated or not— would be permitted to award "the equivalent" of doctorates, master's, bachelor's, and associate degrees, in any academic discipline. Imagine a "doctor of engineering," who received his degree from an unaccredited school, hired by the State to inspect and repair bridges. Cf. *Westbrook v. Penley*, No. 04–0838, 231 S.W.3d 389, 405 (Tex.2007) (holding that tort liability would impinge upon matters of church governance, in violation of the First Amendment, but noting that neither the respondent's nor the public's health or safety were at issue).

---

12. The plurality attempts to substantiate its characterization by the following reasoning: "[S]ection 61.304 strongly encourages compliance with state educational standards, which in turn affect the content and operation of religious educational programs, and in that sense ... affects 'the communication of religious beliefs' ..." 235 S.W.3d at 660 (citations omitted). As discussed above, the Supreme Court requires a much more direct regulatory relationship to trigger the higher level of scrutiny applied by the plurality. In any case, if forbidding religious schools from falsely representing themselves as meeting the State's neutral, otherwise valid educational standards has a negative impact on those schools' enrollment (and thus on their ability to communicate with students), this would seem merely to be evidence of a preference

among potential students for a different type of education, or, at least, for a graduation document that can be passed off as evidence of one. Even a church cannot boost attendance by advertising a raffle and misrepresenting the prize.

13. The Board assessed a $5,000 penalty for each of the thirty-four violations. Twenty-six of the thirty-four violations involved associate, bachelor, master, and doctoral degrees.

14. An absolute adjective is one "having its noun understood, not expressed, as *poor* in *The poor are always with us*." RANDOM HOUSE UNABRIDGED DICTIONARY 7 (2d ed.1993). One need not say "disease" to further describe a person afflicted with "Alzheimer's."

Such a holding would strip the Board of authority to regulate "diploma mills," the very evil the Legislature sought to control through the regulatory scheme set forth in the Education Code. *See* TEX. EDUC.CODE § 61.301. As the Legislature noted in enacting the statute:

It is the policy and purpose of the State of Texas to prevent deception of the public resulting from the conferring and use of fraudulent or substandard college and university degrees; it is also the purpose of this subchapter to regulate the use of academic terminology in naming or otherwise designating educational institutions, the advertising, solicitation or representation by educational institutions or their agents, and the maintenance and preservation of essential academic records. Because degrees and equivalent indicators of educational attainment are used by employers in judging the training of prospective employees, by public and private professional groups in determining qualifications for admission to and continuance of practice, and by the general public in assessing the competence of persons engaged in a wide range of activities necessary to the general welfare, regulation by law of the evidences of college and university educational attainment is in the public interest. To the same end the protection of legitimate institutions and of those holding degrees from them is also in the public interest.

*Id.*

JUSTICE WAINWRIGHT correctly recognizes that the speech at issue is commercial speech. As such, it occupies one of the lowest rungs on the First Amendment hierarchy, enjoying only a " 'limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be imper-

missible in the realm of noncommercial expression.' " *Bd. of Trustees .v. Fox,* 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (quoting *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978)). Commercial speech does "no more than propose a commercial transaction" and may be freely regulated. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973).

In *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Supreme Court outlined its method of analyzing the lawfulness of restrictions on commercial speech:

In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

In this case, JUSTICE WAINWRIGHT cites but misapplies the *Central Hudson* test by excising its first prong. Because HEB Ministries' speech is misleading commercial speech, it is not protected by the First Amendment. *Thompson v. W. States Med. Ctr.,* 535 U.S. 357, 367, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002). As the *Central Hudson* Court noted, "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. *The government may ban forms of*

*communication more likely to deceive the public than to inform it....* " *Central Hudson,* 447 U.S. at 563, 100 S.Ct. 2343 (emphasis added). Thus, "the government may freely regulate commercial speech that ... is misleading," *Florida Bar v. Went For It,* 515 U.S. 618, 623–24, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (citations omitted), and the remaining *Central Hudson* factors apply only if the speech is not misleading.

The record in this case leaves little doubt that HEB Ministries' speech was misleading. The program from Tyndale's June 1998 Commencement Exercises lists various headings, such as "Doctor of Philosophy," "Doctor of Theology," "Doctor of Ministries," "Master of Theology," "Master of Arts," "Bachelor Level Diploma of Theological Studies," and "Associate of Biblical Studies." Beneath each heading are the names of students who had completed those courses of study. The course catalog nowhere states that Tyndale does not offer degrees, and the catalog in fact conveys the opposite impression. It features department heads and faculty members who identify themselves as "doctors," even though they have only diplomas from Tyndale, an institution without a certificate of authority issued by the Coordinating Board. Faculty members use the familiar abbreviations for degrees, such as "Ph.D." and "Th.D." even though they do not have actual degrees. In its advertising materials, Tyndale boasted that its "[g]raduates are ... receiving professional pay increases with Tyndale diplomas, a sign of recognition and acknowledgement." Moreover, the Board found that Tyndale awarded degrees, and HEB Ministries did not appeal that determination.

Because misleading commercial speech may be freely regulated, HEB Ministries' free speech claim must fail, and the Court need not reach the remaining *Central*

*Hudson* factors. But even if the speech were not misleading, the statute easily satisfies the other *Central Hudson* requirements. As the Court recognizes (and HEB Ministries does not dispute), the State's interest here is substantial. "Diploma mills" are an ongoing problem, made more prevalent by the advent of the Internet. *See, e.g.,* Roger J. Cramer, Managing Director, U.S. General Accounting Office, Testimony before the U.S. Senate Committee on Governmental Affairs, Diploma Mills: Federal Employees Have Obtained Degrees from Diploma Mills and Other Unaccredited Schools, Some at Government Expense 7 (May 11, 2004), http:// gao.gov/new.items/d04771t.pdf (May 11, 2004) (all Internet materials as visited August 29, 2007, and available in clerk of court's case file)(noting that some senior-level federal employees, including management-level employees responsible for emergency operations at the National Nuclear Security Administration, had obtained degrees from diploma mills and other unaccredited schools); Pa. Sues College That Gave Cat an MBA, Dec. 7, 2004, http://www.foxnews.com/story/0,2933, 140727,00.html (describing alleged Texas diploma mill that, in exchange for $299, awarded an MBA to a cat in Pennsylvania); Press Release, Texas Office of Attorney General, Attorney General Abbott Gets Judgment Against Brothers Who Operated Fraudulent Dallas Diploma Mill (Mar. 17, 2005), http://www.oag.state.tx.us/ oagnews/release.php?id=841 (describing judgment obtained against Trinity Southern University, which awarded bachelor's, master's, and doctorate degrees based only on students' testimony about life experiences).

Because the State's interest is substantial, *Central Hudson's* other factors come into play: whether the regulation directly advances the State's interest, and whether the regulatory technique is "in proportion

to that interest." *Cent. Hudson,* 447 U.S. at 564, 100 S.Ct. 2343. As the Supreme Court has noted, however, the Constitution does not require the narrowest possible restriction:

> What our decisions require is a " 'fit' between the legislature's ends and the means chosen to accomplish those ends,"—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served"; that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.

*Bd of Trs. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (citations omitted).

Here, the statute represents a reasonable means of accomplishing the Legislature's ends. JUSTICE WAINWRIGHT concludes that a disclaimer would "better inform the public" about Tyndale students' educational accomplishments than would compliance with the statute; thus, he concludes that "the State has not carried its burden of showing that its regulation of this commercial speech directly advances its interest because the regulation is more extensive than necessary to serve the Legislature's legitimate purposes." 235 S. W.3d at 691. But merely because the State has not chosen the narrowest means to achieve its objective does not mean the statute is unconstitutional. As *Fox* recognized, the State need only demonstrate a reasonable fit between the Legislature's ends and the means chosen to accomplish those ends. *Fox,* 492 U.S. at 480, 109 S.Ct. 3028.

The Education Code satisfies those requirements. The statutory requirements here do not diminish commercial speech but merely ensure its accuracy. *See Friedman v. Rogers,* 440 U.S. 1, 16, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (noting that "[r]ather than stifling commercial speech, [the statute at issue] ensures that information regarding optometrical services will be communicated more fully and accurately to consumers than it had been in the past"). While a disclaimer may also fulfill that goal, the absence of such a requirement does not render the statute unconstitutional.

JUSTICE WAINWRIGHT warns that the statute coopts "virtually every term that could reasonably provide a useful description of educational achievement at a postsecondary educational institution." 235 S.W.3d at 689. I disagree. The statute prohibits use of only those terms that "signif[y], purport to, or [are] generally taken to signify satisfactory completion of the requirements of . . . a program of study leading to an associate, bachelor's, master's, or doctor's degree or its equivalent." TEX. EDUC.CODE § 61.302(1). Thus, as the State correctly contends, Tyndale may issue diplomas or certificates without running afoul of the statute, as long as it does not claim that they are equivalent to associate, bachelor's, master's, or doctor's degrees.

JUSTICE WAINWRIGHT would permit partial state regulation of a single word—"degree"—while allowing an institution to represent that its diplomas are indistinguishable from valid degrees. A graduate of one of these unaccredited institutions may now proudly display a framed diploma that says: "ABC Institute has conferred on John Doe the designation *Doctor of Medicine* which is equivalent to a doctoral degree." JUSTICE WAINWRIGHT's proposed holding would strip the Board of

its ability to regulate institutions of higher learning. Diploma mills would stand on equal footing with accredited institutions, and consumers would have no assurance that their professor, engineer, counselor, or chemist graduated from an institution that satisfied the Legislature's minimum requirements for accreditation.

## IV

## Conclusion

Because the statute permissibly regulates commercial speech, and because it presents no Establishment Clause or Free Exercise Clause violation, I respectfully dissent from the part of the Court's judgment that concludes otherwise. I would reverse the court of appeals' judgment relating to the use of the term seminary and would render judgment for the petitioners on that issue. I would affirm the remainder of the judgment.

Justice WAINWRIGHT, joined by Justice JOHNSON, concurring in part and dissenting in part, and concurring in the judgment.

Today the Court reaffirms the sacred principle that Americans have a fundamental right to their religious beliefs. The United States Constitution prohibits the government from interfering with this liberty, as the state has no authority to regulate religious beliefs. I concur in the Court's result on all issues decided, some for different reasons, except one. I agree that the government cannot dictate whether private religious institutions may call themselves "seminaries" as the term admits primarily a religious connotation. Because the training of clerics and teaching of religious doctrines at religious institutions is inherent to religious beliefs, the State also cannot license clerics or regulate their training. I also agree that the government may not preclude religious insti-

tutions from employing virtually any useful terminology to describe the postsecondary educational achievements of their students, but I would hold, contrary to the plurality, that the State, within constitutional limits, may require private educational institutions to comply with minimum educational criteria before they may confer postsecondary degrees on their students. A holding that the Legislature is barred by the U.S. Constitution from setting minimum standards for the issuance of college and graduate degrees by religious institutions, establishes a constitutional right for one type of institution to issue postsecondary degrees regardless of compliance with public standards. This holding precludes the Legislature from considering permissible alternatives, such as allowing religious institutions to issue college degrees with appropriate disclosures on their graduation documents indicating that their degrees are not from state-certified programs (if, for example, they do not include required minimum study in mathematics, science, humanities, written communication, basic computer instruction, or other subjects). This would permanently tie the hands of the Legislature, precluding it from considering constitutionally permissible alternatives so that it may concurrently protect religious freedom while ensuring that all private postsecondary degrees from Texas institutions represent meaningful educational achievement. The Religion Clauses of the First Amendment of the Constitution do not compel this result. The plurality's logic goes astray in melding the act of issuing a postsecondary graduation document with the absolute right to religious beliefs, and fails to recognize that the Legislature's ensuring that all postsecondary degrees are meaningful designations is not an improper targeting of Tyndale's religious beliefs. The government may not under the Constitution dictate

which religious institutions call themselves seminaries, whom they may hire to teach and what curriculum they may teach, but calling a graduation document a bachelor's degree, instead of a bachelor's certificate, is not an issue of religious beliefs, notwithstanding Tyndale's attempt to conflate the two. I also concur with the plurality, for different reasons, that religious institutions have the right to accurately label their graduation documents, as the Free Speech Clause of the Constitution precludes the State from broadly barring private postsecondary institutions from using virtually all terminology that reasonably describes the educational attainment of their students.

## I

## Background

Petitioner HEB Ministries, Inc.[1] is a non-profit Texas corporation and orthodox Christian church that operates, as one of its ministries, the Tyndale Theological Seminary and Bible Institute.[2] Tyndale provides undergraduate and graduate level education to students in ecclesiastical subjects such as theology, apologetics, and Christian studies, and also provides general-education courses such as English grammar, composition, and ancient world history. The Texas Higher Education Coordinating Board fined Tyndale for using terms protected by the Education Code in its name and for issuing some graduation documents to its 1998 graduates which, while not using the protected term "degree," are advertised by Tyndale as equivalent to a degree or as satisfying part of a state-certified postsecondary degree program.

The Board fined Tyndale $3,000 for using the term "seminary" in violation of section 61.313(a)(1) of the Education Code.[3] For "doctrinal reasons" and fear of jeopardizing its "ecclesiastical rights," Tyndale did not seek a temporary certificate of authority from the Board, nor longer-term accreditation from a state-approved accrediting agency.[4] Tyndale now argues that the twenty-one state-mandated standards required for accreditation or a certificate of authority are impermissibly intrusive. *See* 19 TEX. ADMIN. CODE § 7.7. For example, Tyndale claims that the regulation regarding faculty qualifications would prohibit Reverend Billy Graham, Mother Teresa, the Apostles, and a Jewish carpenter born in a manger from teaching at the institution.

The Board also fined Tyndale $170,000 for purportedly issuing "degrees"—as statutorily defined—in violation of section 61.304 of the Education Code. Section 61.304 prohibits private postsecondary institutions from granting "degrees" without first obtaining a certificate of authority from the Board or becoming accredited by a state-approved accrediting agency. TEX.

---

1. HEB Ministries is unrelated to the H.E. Butt Grocery Company, which is also commonly referred to as "HEB."

2. Because their interests are aligned, I use the terms "HEB" and "Tyndale" interchangeably.

3. Section 61.313(a)(1) prohibits a private postsecondary educational institution from using the term "seminary" in its official name unless the entity first obtains a certificate of authority from the Board or becomes accredited by a state-approved accrediting agency.

TEX. EDUC.CODE § 61.313(a)(1); *see also id.* § 61.303(a) (exempting accredited institutions).

4. The court of appeals stated that "Tyndale has steadfastly refused to participate in any of the alternative processes available under the statutory oversight plan." 114 S.W.3d at 630. Tyndale has, however, along with seven other unaccredited religious schools, endeavored to create its own accrediting agency, which the State does not recognize at this time.

EDUC.CODE § 61.304; *see also id.* § 61.303(a) (exempting accredited institutions). "Degree" is broadly defined as

any title or designation, mark, abbreviation, appellation, or series of letters or words, including associate, bachelor's, master's, doctor's, and their equivalents, which signifies, purports to, or is generally taken to signify satisfactory completion of the requirements of all or part of a program of study leading to an associate, bachelor's, master's, or doctor's degree or its equivalent.

*Id.* § 61.302(1). None of the documents awarded by Tyndale at its 1998 graduation were actually titled "degree," but the Board alleges that Tyndale used terminology on the documents and in brochure descriptions that bring the documents within the broad definition of "degree" in section 61.302(1). Though not evident from the statutory language, the Board now concedes that issuing "diplomas" or "certificates," without the protected words or brochure descriptions, is not a violation of section 61.304.

In response to the Board's fines, Tyndale filed this lawsuit seeking a declaratory judgment that applicable sections of the Texas Education Code are unconstitutional under the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment of the United States Constitution, and under the Freedom of Worship Clause in Article I, section 6 of the Texas Constitution. Both Tyndale and the Board filed motions for summary judgment. In

its ruling on these motions, the trial court upheld the fines assessed against Tyndale for granting "degrees," under section 61.304, but vacated the fine for Tyndale's use of the term "seminary," under section 61.313(a)(1), holding that the State's regulation of that term violated the First Amendment of the United States Constitution and Article I, sections 6, 8, and 20 of the Texas Constitution.

The court of appeals reversed the trial court's judgment allowing unregulated use of the term "seminary" and rejected Tyndale's Free Exercise, Establishment Clause, and Free Speech challenges. 114 S.W.3d 617, 633–36. The court of appeals affirmed the trial court's judgment with respect to the granting of degrees, holding that section 61.304 does not violate the Establishment Clause, the Free Exercise Clause, or Tyndale's right to free speech. *Id.* at 628–29, 631–32.

## II

## Constitutional Prohibition Against State Regulation of Religious Convictions

The Religion Clauses provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[5] U.S. CONST. amend. I. They apply to the states through the doctrine of incorporation in the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Free Exercise Clause erects an unqualified prohibition

---

**5.** The Texas Constitution is more explicit in its protection of the freedom to worship. "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences." TEX. CONST. art. I, § 6. The issues are briefed under the U.S. Constitution with reference to analogous provisions in the Texas Constitution. The plurality concludes that the Texas Constitution is "coextensive" on the issues raised. As

neither party addresses in substance the application of the Texas Constitution to these issues and neither asserts any difference in the jurisprudence between the two constitutions, I would "limit our analysis to the First Amendment and simply assume that its concerns are congruent with those of [the Texas Constitution]." *See New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 150 (Tex.2004).

against government interference with beliefs. *State v. Corpus Christi People's Baptist Church, Inc.*, 683 S.W.2d 692, 695 (Tex.1984). The Clause also protects certain conduct motivated by religious beliefs. *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). Under the Establishment Clause, the state may not prefer religion to irreligion or one religion to others, nor may the government exhibit hostility towards religion. *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *see also Bd. of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 703, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994); *Lee v. Weisman*, 505 U.S. 577, 609–16, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Souter, J., concurring). These constitutional principles guide the evaluation of the state regulations at issue.

## A. The Free Exercise Clause

The United States Constitution protects the free exercise of religion from undue state infringement. U.S. Const. amend I, cl. 2, amend XIV, § 1; *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *see also* Tex. Const. art. I, §§ 6, 29.[6] The Free Exercise Clause of the First Amendment protects religious freedom by ensuring that the freedom to hold religious beliefs and opinions is absolute. *Braunfeld v. Brown*, 366 U.S. 599, 603, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). This was reiterated in *Employment Division v. Smith*, where the Supreme Court held that "the First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such.'" 494 U.S. 872, 877, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (quoting *Sherbert v. Verner*, 374 U.S. at 402, 83 S.Ct. 1790 (1963)). The first issue is whether the statutes at issue regulate religious beliefs.[7]

### 1. State Regulation of the Term "Seminary"

Section 61.313(a) of the Texas Education Code requires that all private postsecondary educational institutions in Texas must submit to state regulation in order to call themselves seminaries. Specifically, section 61.313(a) provides:

Unless the institution has been issued a certificate of authority under this subchapter, a person may not: (1) use the term "college," "university," "seminary,"

---

**6.** The Free Worship Clause of the Texas Constitution provides in its entirety:

All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No man shall be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent. No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship. But it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally every religious denomination in the peaceable enjoyment of its own mode of public worship.

Tex. Const. art. I, § 6.

**7.** The Establishment Clause cases consider whether some form of government aid, either direct or indirect, improperly entangles the government in religion. *Walz v. Tax Comm'n*, 397 U.S. 664, 670–75, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). In this case, HEB does not challenge government aid or support of religion or religious symbols but complains of state regulation of its activities. The Supreme Court decided in *Lukumi* that because the dispute raised a question of the freedom to worship in the face of governmental regulation, rather than governmental efforts to benefit or favor religion, the Free Exercise Clause was dispositive. 508 U.S. at 532, 113 S.Ct. 2217; *see also People's Baptist*, 683 S.W.2d at 695.

"school of medicine," "medical school," "health science center," "school of law," "law school," or "law center" in the official name or title of a nonexempt private postsecondary educational institution; or (2) describe an institution using a term listed in Subdivision (1) or a term having a similar meaning.

TEX. EDUC.CODE § 61.313(a). To comply with this section of the Education Code, Tyndale must submit to twenty-one state-established standards. *See id.;* 19 TEX. ADMIN. CODE § 7.7. Tyndale complains that such state regulation violates its rights under the Free Exercise Clause.

The State contends that its regulation of the term "seminary" is neutral and generally applicable, and thus permissible under *Smith.* I disagree. The State does not have the authority to determine whether a private postsecondary educational institution that professes a sincere faith may call itself a "seminary." *See Smith,* 494 U.S. at 888, 110 S.Ct. 1595; *Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). Requiring religious organizations to submit to state regulation in order to call themselves seminaries is at odds with the Free Exercise Clause of the First Amendment of the United States Constitution.

The Board argued in its briefing that the term "seminary" is not an "exclusively religious" one, and the court of appeals apparently agreed. 114 S.W.3d at 633. The Board contended, citing *Church v. Bullock,* 104 Tex. 1, 109 S.W. 115, 117 (1908), that a seminary is a "place of education" and only departs from this secular meaning when the adjectives "theological" or "religious" are placed in front of it to take on the meaning of "a place specifically for the preparation of men for the ministry, or at least, for the teaching of religious doctrines." *In* postsubmission briefing, the Board acknowledged that

"seminary" is a religious term but asserts that the term also conveys a secular meaning.

Statutory interpretation begins with the plain and common meaning of the statute's words. *McIntyre v. Ramirez,* 109 S.W.3d 741, 745 (Tex.2003). As enacted in 1975, section 61.313(a) only included the terms "college" and "university." Act of May 28, 1975, 64th Leg., R.S., ch. 587, § 1, 1975 Tex. Gen. Laws 1867, 1870. The Legislature added the term "seminary" in 1997, along with the terms "school of medicine," "medical school," "health science center," "school of law," "law school," and "law center." Act of May 9, 1997, 75th Leg., R.S., ch. 232, § 1, 1997 Tex. Gen. Laws 1147, 1149. If "seminary" has a predominantly secular meaning, as the Board contends, there is no reason for the Legislature to add it to the list of protected terms, as the addition would only repeat the statute's reference to other secular educational institutions. We presume that each word in the statute has meaning and that the Legislature added seminary to the statute to include within the scope of the statute entities that were not covered by other terms. *See Perkins v. State,* 367 S.W.2d 140, 146 (Tex.1963). The inclusion of "seminary" added religious institutions to the scope of the statute.

In addition, this Court has pondered the meaning of this word before. This Court reasoned in *Bullock* that

"[a] seminary is a place of education ... specifically a school for the education of men for the priesthood or ministry." A seminary being a "place of education," the adjectives "theological or religious" necessarily give to it the meaning of a place specifically for the preparation of men for the ministry, or at least, for the teaching of religious doctrines. The words are commonly so used.

109 S.W. at 117 (quoting 25 Am. & Eng. Ency. Law, 286). In that case, this Court did not hold that it was only when combined with the words "religious" or "theological" that the word "seminary" took on the meaning proposed by HEB Ministries in this case. *See id.* "Seminary" has a primarily religious connotation, and when combined with the word "theological," as in Tyndale Theological Seminary, it has an exclusively religious meaning.

The court of appeals relied, in part, on the definition of "seminary" given in Black's Law Dictionary: "[a]n educational institution, such as a college, academy, or other school." BLACK'S LAW DICTIONARY 1392 (8th ed.2004). Webster's dictionary, however, defines the same term as "an institution for the training of candidates for the priesthood, ministry, or rabbinate." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2064 (1961). Even the Board acknowledges that Tyndale's avowed purpose is to train ministers to work in churches. In the context and usage of the statute, the word "seminary" included in the State's statutory scheme refers to institutions that provide religious education, instruction, and training.

The United States Court of Appeals for the Fifth Circuit has held that, in some circumstances, a seminary qualifies as a "church" for purposes of the ministerial exception. *EEOC v. Sw. Baptist Theological Seminary,* 651 F.2d 277, 283 (5th Cir. 1981). In *Southwestern Baptist,* the court observed that the defendant seminary was an "integral part of a church, essential to the paramount function of training ministers who will continue the faith." *Id.* The court also held that the seminary's faculty qualified as "ministers" for purposes of the exception because the faculty members were "intermediaries between the [Southern Baptist] Convention and the future ministers of many local Baptist Churches."

*Id.* While seminarian policies and philosophies will differ among institutions, *see, e.g., EEOC v. Miss. Coll.,* 626 F.2d 477, 479 (5th Cir.1980), *Southwestern Baptist* is instructive because it recognizes that seminaries often function similarly to churches or other organized congregations. The Board acknowledges that Tyndale's purpose is to train ministers to work in churches. Furthermore, their faculty members may well be akin to church clergy in addition to providing general educational instruction on secular subjects.

I conclude, as does the Court, that the word "seminary" admits a primarily religious meaning, and now consider whether, consistent with the Free Exercise Clause, the State may dictate which institutions may call themselves seminaries.

The Supreme Court has espoused "a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.,* 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952) (declaring unconstitutional a state law that granted ownership of church property to the American branch of the Russian Orthodox Church). This "spirit of freedom" is reflected in many of the Court's decisions regarding state interference in the internal affairs of churches and religious organizations. *See, e.g., NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929).

In 1929, the Supreme Court refused to decide whether an individual was qualified to be a chaplain in the Roman Catholic Church. *Gonzalez,* 280 U.S. at 17, 50 S.Ct.

5. "Because the appointment is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them." *Id.*

In *Catholic Bishop of Chicago,* the Supreme Court considered whether church-operated schools were subject to the jurisdiction of the National Labor Relations Board (NLRB). 440 U.S. at 491, 99 S.Ct. 1313. Although the Court ultimately concluded that Congress did not intend to include church-operated schools within the purview of the National Labor Relations Act, the Court admonished that such an exercise of jurisdiction would raise "serious First Amendment questions" because the NLRB's actions would "go beyond resolving factual issues." *Id.* at 502, 504, 99 S.Ct. 1313. They would

> necessarily involve inquiry into the good-faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.

*Id.*

To decide which institutions are seminaries and which are not, the Board necessarily would have to make judgments concerning which convictions, doctrines, and faiths are religious in nature and which are not. Because Tyndale is HEB Ministries' training institution for ministries, the Board would have to consider whether the school is fulfilling its religious mission to the ministry and if its teachings are sufficiently "theological" in nature to be a seminary. For the government to determine whether sincerely professed religious beliefs are actually secular is an endeavor "fraught with the sort of entanglement that the Constitution forbids." *Hernandez,* 490 U.S. at 697, 109 S.Ct. 2136. This it cannot do. *See Catholic Bishop of Chicago,* 440 U.S. at 502, 99 S.Ct. 1313. Once a person professes a sincere religious conviction or faith, the person's right to her faith is protected by the Constitution and not subject to governmental determinations that they are not religious in nature. *See id.* The Board can no more prohibit a church from calling its school a seminary than it can prohibit a religious congregation from calling itself a church. HEB Ministries' beliefs are protected by the Constitution from government regulation.

Because the term "seminary" admits of a primarily religious meaning, the State has no authority to prohibit Tyndale from using the term in its title, and may not constitutionally require private postsecondary institutions to submit to state regulation in order to do so. Accordingly, section 61.313(a) of the Texas Education Code is unconstitutional to the extent that it regulates this use of the term "seminary."

The Court's result is the same, but its reasoning is a bit different. It adds a distinction between religious institutions that teach a primarily religious curriculum and those which teach a secular curriculum. That distinction is unnecessary. In my view, a religious institution may teach the curriculum it desires, religious, secular, or mixed, and call itself a "seminary" without first submitting to state regulation.

## B. State Regulation of Issuance of Degrees by a Religious Institution

Religious beliefs are immune from government regulation. *See Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Conduct motivated by religious beliefs also enjoys important constitutional protection. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hial-*

*eah,* 508 U.S. 520, 531–33, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). However, the Supreme Court has held that religiously motivated conduct is not always immune from state regulation. For example, states may ban the taking of controlled narcotics as a religious practice. *Employment Div. v. Smith,* 494 U.S. 872, 890, 110 S.Ct. 1595 (1990). Government prohibition of the religious practice of polygamy is not contrary to the constitutional right to religious freedom. *Reynolds v. United States,* 98 U.S. 145, 164–66, 25 L.Ed. 244 (1878). The Amish are required, as are other employees, to pay social security taxes even though their faith precludes their participation in government support programs. *United States v. Lee,* 455 U.S. 252, 258–61, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *see Cantwell,* 310 U.S. at 303–04, 60 S.Ct. 900. And church-affiliated day care facilities generally are not exempt from compliance with regulations to protect the health and safety of the children in their care. *State v. Corpus Christi People's Baptist Church,* 683 S.W.2d 692, 696–97 (Tex.1984). To implicate religious Free Exercise Clause protections, the conduct at issue must be motivated by religious beliefs, which underlies the debate over whether placing "Ph.D." at the top of graduation parchment is religiously motivated conduct. *See Lukumi,* 508 U.S. at 532, 113 S.Ct. 2217.

The Supreme Court has developed different levels of scrutiny to apply to state regulations that burden religious conduct. Laws that target religious practices are subject to the most rigorous constitutional scrutiny under religion clause jurisprudence. *Id.* at 533, 113 S.Ct. 2217. Such state burdens must be narrowly tailored to satisfy a compelling governmental interest. *Id.; Smith,* 494 U.S. at 878–79, 110 S.Ct. 1595. Laws that substantially burden a person's exercise of religion, even without expressly targeting religious practices for regulation, are likewise subject to strict scrutiny. *Sherbert v. Verner,* 374 U.S. 398, 402–03, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Thomas v. Review Bd. of the Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest."); *Hobbie v. Unemployment Appeals Comm'n of Fla.,* 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) ("The Appeals Commission does not seriously contend that its denial of benefits can withstand strict scrutiny; rather it urges that we hold that its justification should be determined under the less rigorous standard.... We reject the argument again today."). State action that does not target religion or substantially burden religious conduct but only incidentally burdens religious practices may pass constitutional muster if it is otherwise valid and does not impact religion disparately, i.e., the laws are neutral and generally applicable. *Smith,* 494 U.S. at 878, 110 S.Ct. 1595 ("[I]f prohibiting the exercise of religion ... is not the object of the tax but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended."). The Supreme Court rejected the argument that neutral and generally applicable laws that incidentally burden religious practices are subject to strict scrutiny and suggested that a reasonable relationship test determines whether they are constitutional. *See id.* at 885–86 & n. 3, 110 S.Ct. 1595.

The Supreme Court established these standards in several cases over the years. Although the opinions have been the subject of an active discussion in legal publications, the Supreme Court's pronouncements are binding until changed. *See* Kathleen A. Brady, *Religious Organizations and Free Exercise: The Surprising*

*Lessons of* Smith, 2004 BYU L. REV. 1633 (2004); Christopher L. Eisgruber & Lawrence G. Sager, *The Vulnerability of Conscience: The Constitutional Basis for Protecting Religious Conduct,* 61 U. CHI. L. REV. 1245 (1994); Douglas Laycock, *Formal, Substantive, and Disaggregated Neutrality Toward Religion,* 39 DEPAUL L.REV. 993 (1990); Douglas Laycock, *The Supreme Court and Religious Liberty,* 40 CATH. LAW. 25 (2000); Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision,* 57 U. CHI. L.REV. 1109 (1990); Michael W. McConnell & Richard A. Posner, *An Economic Approach to Issues of Religious Freedom,* 56 U. CHI. L. REV. 1 (1989). In the seminal case of *Sherbert v. Verner,* the Supreme Court held that a substantial burden on the exercise of religious beliefs is subject to strict scrutiny. 374 U.S. 398, 402–03, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). A member of the Seventh-day Adventist Church quit employment that required her to work on her Saturday sabbath, and was subsequently denied unemployment benefits for declining without "good cause" to accept other employment that also required work on Saturday. *Id.* at 406, 83 S.Ct. 1790. The Court framed the issue as "whether some compelling state interest enforced in the eligibility provisions of the . . . statute justifies the substantial infringement of the appellant's First Amendment right." *Id.* Finding no compelling governmental interest at issue, the Court held that the denial of unemployment benefits violated the plaintiff's free-exercise rights. *Id.* at 406–07, 83 S.Ct. 1790; *see Thomas,* 450 U.S. at 718, 101 S.Ct. 1425.

In 1990, the Supreme Court addressed an incidental rather than substantial infringement on religious conduct. Explicitly addressing for the first time religious conduct restricted by a state criminal law of general applicability, the Supreme Court in *Smith* applied a lower standard to the constitutional challenge in that case than it did in *Sherbert.* 494 U.S. at 885–86, 110 S.Ct. 1595. Two members of the Native American Church brought a free exercise challenge to an Oregon law criminalizing the "knowing or intentional possession of a 'controlled substance' unless the substance has been prescribed by a medical practitioner." *Id.* at 874, 110 S.Ct. 1595 (referring to ORE. REV. STAT. § 475.992(4) (1987)). The plaintiffs were discharged from their jobs for ingesting peyote, a "controlled substance" under Oregon law, for sacramental purposes during a Native American Church ceremony. *Id.* They claimed the Oregon law was unconstitutional as applied to them because it interfered with their exercise of religion. *Id.*

The Court reaffirmed that "first and foremost" the Free Exercise Clause means "the right to believe and profess whatever religious doctrine one desires," and precludes "all 'governmental regulation of religious *beliefs* as such.'" *Id.* at 877, 110 S.Ct. 1595 (quoting *Sherbert,* 374 U.S. at 402, 83 S.Ct. 1790). Distinguishing the regulation of religious beliefs from the regulation of conduct, the Court observed that it has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Id.* at 878–79, 83 S.Ct. 1790. The right of free exercise "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879, 83 S.Ct. 1790 (quoting *Lee,* 455 U.S. at 263 n. 3, 102 S.Ct. 1051). To require strict scrutiny of the criminal statute in the case "would produce . . . a private right to ignore generally applicable laws . . . [which] is a constitutional anomaly." *Id.* at 886, 83

S.Ct. 1790. The Court held that neither the text of the Constitution nor Court precedent require that states allow use of a controlled substance as a religious practice. *Id.* at 887–88, 83 S.Ct. 1790.

The Court expressly declined to extend the strict scrutiny balancing test of *Sherbert* to govern "the analysis of generally applicable prohibitions of socially harmful conduct." *Id.* at 889–90, 83 S.Ct. 1790. Thus, the state need not establish a compelling interest to institute incidental burdens on a person's religious practices, so long as it does so through a neutral and generally-applicable criminal law that does not otherwise violate the Constitution. *Id.*[8]

The Court affirmed the holding in *Smith* three years later in *Lukumi*, 508 U.S. 520, 113 S.Ct. 2217. *Lukumi* involved a set of city ordinances that prohibited the religious sacrifice of animals by the Santeria religion and imposed criminal sanctions for their violation. *Id.* at 525–28, 113 S.Ct. 2217. The Court reaffirmed "the general proposition that a law that is neutral and of general applicability" and only *incidentally* burdens religious practices need not be narrowly tailored to advance a compelling government interest. *Id.* at 531–32, 113 S.Ct. 2217. The city ordinances at issue were held unconstitutional, however, because they were neither neutral nor generally applicable but targeted the religious practices of the Santeria religion. *Id.* at 541, 545–46, 113 S.Ct. 2217.

In *Lukumi*, the Court observed that "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533, 113 S.Ct. 2217. Although passing facial review, the laws in question were not neutral because Santeria worship was the "object" or "target" of the city's ordinances. *Id.* at 534–40, 113 S.Ct. 2217. The Court determined that the "design" of the laws accomplished "a religious gerrymander, an impermissible attempt to target petitioners and their religious practices." *Id.* at 535, 113 S.Ct. 2217 (citation omitted).

Addressing the "general applicability" requirement, the *Lukumi* Court observed that "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief" and that this principle "is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543, 113 S.Ct. 2217. Although the Court did not define the standard for general applicability, the Court held that "these ordinances fall well below the minimum standard necessary to protect First Amendment rights." *Id.* In arriving at this conclusion, the Court observed that the ordinances were vastly underinclusive and included many secular exemptions. *Id.* at 543–46, 113 S.Ct. 2217. Failing both the neutrality and general applicability prongs, the *Lukumi* Court applied "the most rigorous of scrutiny" to the City of Hialeah's ordinances and held them unconstitutional because they were "designed to

---

**8.** Distinguishing its prior holdings in Free Exercise Clause cases, the Supreme Court stated that the "only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press." *Smith,* 494 U.S. at 881, 110 S.Ct. 1595 (citing, among others, *Cantwell,* 310 U.S. at 304–07, 60 S.Ct. 900; *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)). The Court determined that *Smith* did not present a "hybrid rights" case, and therefore did not elaborate on the exception.

persecute or oppress a religion." *Id.* at 547, 113 S.Ct. 2217.

The parties disagree which level of scrutiny should apply to section 61.304 of the Education Code. HEB Ministries contends that because the State's regulatory scheme provides for secular exemptions, but not religious ones, it is not neutral and, accordingly, the statutory scheme must be analyzed under strict scrutiny. *See Lukumi,* 508 U.S. at 537, 543–46, 113 S.Ct. 2217; *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,* 170 F.3d 359, 363 (3d Cir.1999). Specifically, HEB Ministries points to section 61.303 of the Education Code, which exempts some institutions from being required to have a Board-issued certificate of authority if they have been accredited by a state approved accrediting agency. HEB also cites section 61.313, which exempts some educational institutions from the prohibition on protected terms if they used the terms "college" or "university" in their title prior to September 1, 1975. TEX. EDUC.CODE §§ 61.303, 61.313. HEB Ministries further contends strict scrutiny applies because this is a hybrid rights case involving multiple constitutional claims, including claims based on the Free Speech Clause, Free Exercise Clause, and Establishment Clause. *See Smith,* 494 U.S. at 881, 110 S.Ct. 1595.

The State contends that section 61.304 is neutral and generally applicable, and therefore under *Smith,* this Court must not apply the *Sherbert* strict scrutiny analysis. According to the State, the laws at issue apply to all private postsecondary educational institutions—religious and secular alike—that grant postsecondary academic degrees. The State also contends there is no evidence that the object of the statutory scheme was to infringe upon or restrict practices because of their religious motivation or to suppress religious beliefs.

As explained in *Lukumi,* the beginning point is the statute's text, for the minimum requirement of neutrality is that a law not discriminate on its face. *Lukumi,* 508 U.S. at 533, 113 S.Ct. 2217. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context. *Id.* A facial reference to religion in a statute does not necessarily render it presumptively unconstitutional, *see Locke v. Davey,* 540 U.S. 712, 725, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004), nor is facial neutrality alone determinative. *Lukumi,* 508 U.S. at 533–34, 113 S.Ct. 2217. The Free Exercise Clause, like the Establishment Clause, "forbids subtle departures from neutrality," *Gillette v. United States,* 401 U.S. 437, 452, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), and covert suppression of particular religious beliefs. *Bowen v. Roy,* 476 U.S. 693, 703, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (opinion of Burger, C.J.). Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. "The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Walz v. Tax Comm'n,* 397 U.S. 664, 696, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring); *see Lukumi,* 508 U.S. at 534, 113 S.Ct. 2217.

According to Tyndale, section 61.304 is unconstitutional because it forces Tyndale to submit to the State's regulations in order to award college degrees to describe the educational attainment of its students. *See Nat'l Labor Relations Bd. v. Catholic Bishop of Chicago,* 440 U.S. 490, 502, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Section 61.304 precludes private postsecondary institutions from awarding degrees unless the Board has issued the institution a certificate of authority, and to obtain such a

certificate requires submission to the twenty-one standards governing curriculum, faculty, and school governance. TEX. EDUC.CODE § 61.304.

The Legislature explained its purposes for enacting these requirements for private postsecondary education institutions. "It is the policy and purpose of the State of Texas to prevent deception of the public resulting from the conferring and use of fraudulent or substandard college and university degrees...." *Id.* § 61.301. The Legislature also explained:

> Because degrees and equivalent indicators of educational attainment are used by employers in judging the training of prospective employees, by public and private professional groups in determining qualifications for admission to and continuance of practice, and by the general public in assessing the competence of persons engaged in a wide range of activities necessary to the general welfare, regulation by law of the evidences of college and university educational attainment is in the public interest. To the same end the protection of legitimate institutions and of those holding degrees from them is also in the public interest.

*Id.*

This Court recognized recently, quoting *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954), that "education is perhaps the most important function of state and local governments." *Neeley v. West Orange–Cove Consol. Indep. Sch. Dist.,* 176 S.W.3d 746, 799 (Tex.2005). The United States Supreme Court held that Congress' stated purpose in enacting the Higher Education Act of assisting colleges in ensuring that large numbers of youth obtain educations is a "legitimate secular objective entirely appropriate for governmental action." *Tilton v. Richardson,* 403 U.S. 672, 679, 91

S.Ct. 2091, 29 L.Ed.2d 790 (1971). The Supreme Court further explained that "[t]here is no doubt as to the power of a State, having high responsibility for education for its citizens, to impose reasonable regulations for the control" of education. *Wisconsin v. Yoder,* 406 U.S. 205, 213, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *see also Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 534, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). And the New Jersey Supreme Court held that the privilege of granting degrees, evidential of academic achievement, is "very intimately related to the public welfare, and is unquestionably subject to regulation by the State." *Shelton Coll. v. State Bd. of Educ.,* 48 N.J. 501, 226 A.2d 612, 618 (1967) (quoting ELLIOTT, THE COLLEGES AND THE COURTS 200 (1936)). The purpose of ensuring the quality of postsecondary education provided by institutions in this State and protecting the integrity of college degrees issued therefrom is plainly within the State's substantial interest in education.

The Legislature's objective is to ensure that the granting of a degree is a meaningful act grounded in established curricular and instructional standards and that persons who rely on a postsecondary degree, lawfully issued by a Texas institution, may accurately presume a level of competence and qualification. *See* TEX. EDUC.CODE § 61.301. The Legislature enforces this objective in education, an area in which it has a substantial and legitimate interest. *See Yoder,* 406 U.S. at 213, 92 S.Ct. 1526; *Neeley,* 176 S.W.3d at 753. Moreover, all postsecondary institutions, whether secular or religious, private or public, must submit to the State's standards to grant college or graduate degrees. *See* TEX. EDUC.CODE §§ 61.0512, 61.304; 19 TEX. ADMIN. CODE § 7.7(13) (requiring certain degree programs at private postsecondary

institutions to include "Humanities and Fine Arts, Social and Behavioral Sciences, and Natural Sciences and Mathematics" as well as "courses to develop skills in written and oral communication"). An institution may operate outside those standards if it chooses to use nomenclature on its graduation documents other than college or graduate degrees (e.g., bachelor's level certificate), but to issue degrees it must comply with public standards. There is no disparate treatment of any category of institutions.

The law here is neutral and generally applicable and prohibits the unauthorized issuance of college and graduate degrees, currently enforced by both civil and criminal penalties. The Supreme Court held in *Smith* that individuals must comply with valid laws prohibiting conduct that the State is free to regulate. 494 U.S. at 878–79, 110 S.Ct. 1595. In this case, I do not believe the Constitution bans states from promulgating generally applicable standards that must be met before postsecondary institutions may confer degrees on its students.[9]

The Office of the Attorney General for the State of Texas has opined on this very issue: whether rights under the Free Exercise Clause permit a religious organization to operate a degree-awarding university without compliance with state standards. Op. Tex. Att'y Gen. No. JC–0200 (2000). Attorney General John Cornyn concluded that "the application to re-ligious educational institutions of state laws regulating the awarding of degrees does not violate the law restricting governmental burdens on the free exercise of religion." *Id.*[10]

The only other state supreme court to address this issue also reached the same outcome. The Tennessee Supreme Court held that the Tennessee Postsecondary Education Authorization Act's prohibition on the issuance of degrees by postsecondary institutions, unless they complied with state standards, did not violate the Free Exercise Clause of the First Amendment. *State ex rel. McLemore v. Clarksville Sch. of Theology,* 636 S.W.2d 706 (Tenn.1982). It held that the granting of degrees is "unquestionably subject to regulation by the State" and is not a religious activity. 636 S.W.2d at 709; *see Shelton Coll. v. State Bd. of Educ.,* 48 N.J. 501, 226 A.2d 612 (1967) (rejecting a claim that the First Amendment right of free speech prohibited the state from regulating the power to confer a bachelor's degree).

To the extent an institution desires to enter into this sphere of legitimate state regulation—e.g., the granting of college, university, and graduate degrees by private postsecondary educational institutions—it must comply with state mandates that are not unnecessarily intrusive and are prompted by legitimate objectives. *See Smith,* 494 U.S. at 878–79, 110 S.Ct. 1595; *Lee,* 455 U.S. 252, 261, 102 S.Ct.

9. The Southern Baptist Convention's theological seminary agrees that pursuant to its constitutional interest in education, the State may "forbid institutions from using the words 'bachelor's degree,' 'master's degree,' etc., unless certain defined program requirements are satisfied." Brief for Southwestern Baptist Theological Seminary as Amicus Curiae at 14.

10. The Attorney General's opinion considered the Supreme Court's free exercise jurisprudence. A Texas statute required application of the strict scrutiny test for substantial government burdens on religious practices. Tex. Civ. Prac. & Rem.Code § 110.001 et seq. This mimicked the standard required by the Supreme Court in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Although I do not think the result here would change if the statute applied, the statute is inapplicable as its effective date was after the accrual of the cause of action in this case. *See* Tex. Civ. Prac. & Rem.Code § 110.001 et seq.

1051 (1982). A contrary conclusion would allow entities, regardless of their motives, to circumvent the statutory requirements under the guise of religious practices by issuing degrees supported by little or no meaningful educational attainment. This would undermine the legitimate objectives of precluding issuance of fraudulent degrees and ensuring that society could rely on the attainment of a college degree as evidence of meaningful postsecondary educational accomplishment.

Because in this case Tyndale is engaging in commercial conduct the State is free to regulate—the granting of educational "degrees," "associate degrees," "bachelor's degrees," "master's degrees," and "doctorate degrees,"—I conclude that section 61.304 of the Education Code does not offend the Free Exercise Clause of the United States Constitution. See id. at 878–79, 110 S.Ct. 1595; Lukumi, 508 U.S. at 531–33, 113 S.Ct. 2217.

The plurality concludes that Tyndale has a constitutional right to issue college and graduate degrees without compliance with the Legislature's standards. Of course, Tyndale does not frame its case in this fashion because the idea in this context that only one type of postsecondary institution, a seminary, has an unfettered constitutional right to put the title "college degree" at the top of its graduation documents, without regard to compliance with public standards, is a tenuous notion. Instead, Tyndale enmeshes its argument on this issue with the bedrock principle that the State cannot regulate the doctrinal beliefs and teachings of a church's school. Wrapped in this theological flag, Tyndale's arguments then focus on religious beliefs and bury the real issue of the appropriate words to title a graduation document beneath it. I disagree that the Constitution bars the Legislature from establishing generally applicable standards for the granting of postsecondary educational degrees. This question concerns conduct—whether Tyndale can put "college degree," with no disclaimer or explanation that it does not comply with public standards at the top of its graduation documents. No one, including the Board, disputes Tyndale's right to believe and teach whatever it chooses and hire whomever it desires to do so.

Of course, it sounds patently offensive to religious freedoms to assert that the State is barring Mother Teresa and Reverend Billy Graham from teaching at a seminary, and if correct, it would be. But doctrine and instruction are not tantamount to stamping a title on a piece of parchment handed out at graduation. Governments cannot regulate what a seminary teaches, who it hires to teach, or how its administration is structured. These matters are central to the seminary's beliefs and convictions, and the freedom to believe as one chooses is absolute. See Braunfeld v. Brown, 366 U.S. 599, 603, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). Typing the letters "Ph.D." on a parchment is an act that is not inherent to Tyndale's religious beliefs or engaged in for religious reasons, and should not be accorded constitutional protection under the religion clauses. See Smith, 494 U.S. at 877, 110 S.Ct. 1595. The Legislature could decide to allow it, but the Constitution does not require it. The plurality strains to persuade that because the Board does not allow Tyndale to confer degrees without compliance with the statutes, that it is dictating the doctrine that may be taught at the seminary. I remain unconvinced.[11] Tyndale, howev-

---

11. The plurality's rationale is in tension with the Supreme Court's Smith and Lukumi deci- sions.

er, is correct that it should be able to use meaningful designations on "official looking paper" to convey what it believes to be substantial educational achievement. (*See* infra, Section III). This does not require, as the plurality concludes, creation of a constitutional right of religious, but not non-religious, postsecondary institutions to issue college and graduate degrees. Although different from this case, the plurality's reasoning would grant a constitutional right to a religious group to confer a doctor of philosophy degree on a graduation parchment after providing an hour of instruction.

The Education Code's broad definition of the term "degree" precludes use of many words similar to "degree." Tyndale asserts that section 61.304 of the Education Code, by virtue of the definition of "degree" in 61.302(1), regulates virtually all useful terminology that it may use to convey the educational achievement of its students. Although I believe that the granting of degrees is conduct the Legislature may regulate, the State's attempt to regulate Tyndale's use of any language suggesting a similar or competing level of educational competency also must be valid under the Free Speech Clause of the First Amendment.

### III

#### Free Speech

HEB Ministries contends that the State's regulatory scheme violates its rights to free speech under the First Amendment of the United States Constitution because the State has usurped virtually all terms it could reasonably use to describe the educational achievement of its students. *See* U.S. CONST. amend. I, cl. 3 ("Congress shall make no law ... abridging the freedom of speech...."); TEX. CONST. art. I, § 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."). The State, in contrast, asserts that the speech at issue is commercial speech and, pursuant to federal constitutional law, the State has a substantial interest in curtailing the proliferation of diploma mills and assuring that indicia of educational attainment are accurate, and that the challenged statutes directly advance that governmental interest. HEB contends that, even if the speech at issue is commercial, the State must still show that the speech restrictions are narrowly drawn to serve that substantial interest. Tyndale's contention is that the State's regulation of any title, word, appellation, and other terminology not only "equivalent" to degree but suggesting a course of study toward a postsecondary degree or "its equivalent" is an unconstitutionally broad prohibition on Tyndale's free-speech rights.

The court of appeals agreed with the State that its regulation of the terms "degree," "associate," "bachelor," "master," "doctor," and other "equivalents" in sections 61.304 and 61.302(1) targets commercial speech. 114 S.W.3d at 631–32. The Supreme Court's case law confirms that determination. Commercial speech is speech that seeks to propose a commercial transaction or is expression that serves the economic interests of the speaker. *Bd. of Trs. v. Fox*, 492 U.S. 469, 473, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The First Amendment's protection of commercial

speech is based on advertising's informational function, which equips persons to act in their own best interests. *Cent. Hudson,* 447 U.S. at 562–63, 100 S.Ct. 2343. To help fulfill this goal, there is a "constitutional presumption favoring disclosure over concealment," because "disclosure of truthful, relevant information is more likely to make a positive contribution to decisionmaking than is concealment of such information." *Peel v. Attorney Registration & Disciplinary Comm.'n,* 496 U.S. 91, 108, 111, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990); *see Ibanez v. Fla. Dept. of Bus. & Prof'l Regulation,* 512 U.S. 136, 142, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994). The First Amendment presumes that some accurate information is better than no information at all. *Cent. Hudson,* 447 U.S. at 562, 100 S.Ct. 2343. On this basis, the Supreme Court held that use of the designations CPA (certified public accountant) and CFP (certified financial planner) are commercial speech. *Ibanez,* 512 U.S. at 143–44, 114 S.Ct. 2084. The terms "Dr." and "Ph.D." have also been held to be commercial speech. *Strang v. Satz,* 884 F.Supp. 504, 507 (S.D.Fla.1995). The title "M.D." has also been analyzed under the commercial speech doctrine. *State ex rel. State Bd. of Healing Arts v. Thomas,* 33 Kan.App.2d 73, 97 P.3d 512, 523–24 (2004). The conferral of degrees is largely a commercial activity and a privilege granted to institutions by the states in which they operate. *See Nova Univ. v. Educ. Inst. Licensure Comm'n,* 483 A.2d 1172, 1181 (D.C.1984) ("degree conferral is business conduct, a corporate privilege conferred by the state of incorporation," and accordingly, "[e]ducational institutions have no inherent or constitutional right to confer degrees"). Courts have treated the display of terms such as "fellow," "associate fellow," "board certified," "certified," and "specialist" as commercial speech. *See Borgner v. Brooks,* 284 F.3d 1204, 1207,

1210 (11th Cir.2002) (relying upon the Eleventh Circuit's treatment of the title "psychologist" in *Abramson v. Gonzalez,* 949 F.2d 1567, 1574–75 (11th Cir.1992)); *Potts v. Hamilton,* 334 F.Supp.2d 1206, 1209, 1213–15 (E.D.Cal.2004); *Bingham v. Hamilton,* 100 F.Supp.2d 1233, 1234–35, 1239 (E.D.Cal.2000) (all three cases involve statutes prohibiting dentists, who specialize in implant dentistry and are certified by organizations not recognized by the state, from advertising certain credentials).

Tyndale provides educational and ministerial training courses to its students and the students pay tuition and fees. Tyndale's conferral of titles on its graduating students and advertisement of information about degrees it awards to graduating students is commercial speech.

Restrictions on commercial speech are reviewed under the test established in *Central Hudson,* 447 U.S. 557, 100 S.Ct. 2343. The Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 563, 100 S.Ct. 2343. The State may ban commercial speech which concerns unlawful activity or is false, deceptive, and misleading. *Ibanez,* 512 U.S. at 142, 114 S.Ct. 2084; *Cent. Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. Otherwise, commercial speech may not be restricted unless 1) the government has a substantial interest in restricting the speech, 2) the regulation directly advances the asserted governmental interest, and 3) the speech restrictions are narrowly drawn such that they are no more extensive than necessary to serve that interest. *Cent. Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. The Court clarified in *Fox,* 492 U.S. at 480, 109 S.Ct. 3028, that the requirement of narrowly constructing the restriction does not compel the state to employ the restriction that is "absolutely the least severe that will achieve the desired end." The law re-

quires that the restriction of commercial speech be in proportion to the interest served. *Id.* The proponent of the restriction on commercial speech carries the burden of justifying it. *Edenfield v. Fane,* 507 U.S. 761, 770, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993).

The parties do not dispute that the speech at issue concerns lawful activity and the Board does not contend that the expression is false. The State contends only that it seeks to regulate Tyndale's potentially deceptive speech. As previously observed, the State's interest in ensuring the quality of postsecondary educational institutions that issue degrees in this state is substantial. And Tyndale does not contest that the State has a substantial interest in regulating private postsecondary education, or that the State may endeavor to assure that degrees accurately portray educational attainment and to prevent the operation of illegal diploma mills. I consider the other two prongs of the test for permissible regulation of commercial speech and determine whether sections 61.304 and 61.302(1) of the Education Code directly advance the State's interest, and whether narrower limitations could be crafted to ensure the potentially misleading information is presented in a nonmisleading manner.

Restricting an unaccredited institution's ability to award degrees directly advances the State's interest because

> degrees and equivalent indicators of educational attainment are used by employers in judging the training of prospective employees, by public and private professional groups in determining qualifications for admission to and continuance of practice, and by the general public in assessing the competence of persons engaged in a wide range of activities necessary to the general welfare.

TEX. EDUC.CODE § 61.301. The Legislature may also address conduct that attempts to accomplish indirectly that which is prohibited directly in the statute. Thus, for example, the State may preclude an institution that does not meet its standards from lawfully calling its graduation documents master's degrees yet representing through other means that "certificates" it issues have complied with the State's educational standards for a master's degree.

Tyndale responds that the State's nearly complete usurpation of reasonable terms to describe postsecondary educational attainment is not tailored to directly serve the State's objectives. Unless certified by the Board, the statute bars a postsecondary institution's use of "*any* title or designation, mark, abbreviation, appellation, or series of letters or words, including associate, bachelor's, master's, doctor's, *and their equivalents*" to describe private postsecondary achievement which leads to a degree or partially fulfills a degree program "or its equivalent." *Id.* § 61.302(1) (emphasis added). The State responds that HEB could issue "certificates," "advanced certificates," "diplomas," or "higher diplomas" so long as it refrains from describing them as equivalent to an associate's, bachelor's, master's, or doctor's degree. The State also contends that the statutes are narrowly tailored because HEB Ministries is still free to advertise its qualifications, services, and missions, so long as it does not use the protected terms—degree, associate, bachelor's, master's, and doctor's—that suggest approval by the State and satisfaction of minimum educational standards that society has come to expect of these terms. The State also argues the statutes are narrowly tailored because Tyndale could not be fined for, and would not be prohibited from issuing, for example, a "diploma" or "certificate" because these terms by themselves

do not signify, purport to signify, and are not generally taken to mean "a program of study leading to an associate, bachelor's, master's, or doctor's degree or its equivalent." [12]  *See id.*

A plain reading of the statute conveys a much broader prohibition than the Board concedes.  First, under the statute a "degree" includes the protected terms associate, bachelor's, master's, doctor's and degree.  *Id.*  Generally, the definition requires that for protected words or titles to trigger state regulation, they be described or perceived as leading to a degree at the associate, bachelor's, master's or doctorate level.

The Board asserts that an institution must be certified to use any of these protected terms by themselves because they suggest and are generally understood to indicate that a recipient completed part or all of a program leading to a degree.  The statutory language indeed extends that broadly.  Second, the statute also defines a "degree" to include any word, title, designation, series of letters, or similar terminology to the protected terms that suggest study toward a state-recognized degree.  Further extending the scope of the statute, the Legislature barred use of "any title," "designation," "words," "mark," "series of letters," or "appellation" that conveys study leading to a degree, or any similar posteducational achievement.  *Id.*  The language of 61.302(1) encompasses virtually every term that could reasonably provide a useful description of educational achievement at a postsecondary educational institutional.  The legislation bans unapproved programs from using any of the protected terms, any words, letters, or titles that are similar to the protected terms and any words that suggest a program leading to a college or graduate degree or any words that are similar to the titled programs.  The language of section 61.302(1) supports the Board's fines for use of the word "diploma" and "certificate" and provides a basis for fining unaccredited institutions for using the phrases "bachelor's level diploma" and "comparable to an associate's degree."  The statute impermissibly bars Tyndale from issuing a master's level certificate or an associate's level diploma, terms which do not convey state certification of a degree, but do convey postsecondary education accomplishment.  A majority of the Court decides that for religious instruction by religious schools, the regulation of educational terminology under the statute's broad definition of degree violates constitutional standards.  235 S.W.3d. 658.  (In Section III.C., the plurality states that "the use of any words remotely resembling ordinary education terms is risky").[13]  The appellations that the public understands to indicate college and graduate level study would all be equivalent or similar to the protected terms and "their equivalents."

The Board's concession that Tyndale may use "certificate" or "diploma" on its graduation documents without state approval is not helpful.  Under the statute, the words "diploma" and "certificate" certainly are "titles," "words," or "appellations" and they are similar to the protected term "degree."  Thus, by its terms the statute bars any use of "diploma" and "cer-

---

**12.** Webster's Dictionary defines "equivalent as similar or alike in significance or import." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 769 (1961).  The Oxford Dictionary defines "equivalent" as having equal or corresponding import or meaning.  The Oxford Illustrated Dictionary 283 (2nd ed.1975).

**13.** We disagree on which constitutional provisions are infringed.  I would base the decision on commercial speech rights, and the plurality would decide this point under the Free Exercise Clause.

tificate" that may indicate completion of all or part of a program leading to a degree. However, even if the Board's concession is correct under the language of the statute, the concession is not useful without being able to tie the terms "diploma" or "certificate" to some description of a recognized or similar level of postsecondary educational attainment, and the statute precludes making that connection. For example, Tyndale could likely issue a "diploma of theological studies" which would not convey its apparent belief that its program is comparable to college level course work because diplomas generally are issued at the high school educational level. *See* Brief for Independent Colleges and Universities of Texas, Inc. as Amicus Curiae at 12–13 (explaining that there is a public perception that a degree qualifies an individual to perform in their chosen field of study.) [14] If Tyndale issued a "diploma of bachelor's level studies", which would more accurately convey its contentions about its program, that title would violate the statute. The Board concedes the use of terms that would not allow Tyndale to accurately describe its belief about the level or quality of it programs. The Board's concession does not resolve the free speech problems Tyndale raises.

Section 61.302(1)'s prohibitions on First Amendment expression further preclude private postsecondary educational institutions from advertising comparisons with state-certified institutions. For example, the Board objects to Tyndale's description of its Diploma of Theological Studies as "stronger ... than the typical Bachelors in Biblical Studies." Such a description suggests that Tyndale's program is better than state-certified Bachelor's Degree programs.[15] Fining private institutions for making legitimate comparisons that their programs are similar to or better than state-certified programs leading to a degree does not equip persons to act in their own interests. Instead, it punishes institutions for disclosure of truthful, relevant information that is likely to make a positive contribution to decision making. *See Peel,* 496 U.S. at 108, 110 S.Ct. 2281; *Cent. Hudson,* 447 U.S. at 567–68, 100 S.Ct. 2343. This restriction contradicts the First Amendment's purpose for commercial speech.

Moreover, the applicable portions of sections 61.304 and 61.302(1) operate as a ban on not only potentially misleading speech but also on truthful speech. Tyndale issued diplomas and certificates which may be as good as or better than some state-certified programs, and other private institutions, whether religious or nonreligious, would have the same complaint that legitimate comparisons are being improperly silenced. The regulation is more extensive than necessary to serve the State's legitimate interests. Under 61.302(1), Tyndale cannot use any terms that are similar to the protected terms, and it cannot describe its programs as similar to or better than state-approved programs leading to a degree. The statute cuts an impermissibly broad swath through protected commercial speech.

As previously stated, the standard for judging restrictions on commercial speech is that the restriction be in proportion to the interest served. *Fox,* 492 U.S. at 480, 109 S.Ct. 3028. The availability of more limited alternatives that are less restrictive

---

14. The Independent Colleges and Universities of Texas, Inc. is a nonprofit association of the State's accredited private colleges and universities. It represents the majority of the State's private undergraduate institutions.

15. If the description indicated that Tyndale's program in theological studies was certified by the State, the speech would be false and subject to legitimate regulation.

of speech is strong support for a conclusion that the regulation does not directly advance the desired goal. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002). The Supreme Court's analysis indicates that courts should inquire whether the government could achieve its interests in a manner that does not restrict speech or is less restrictive of commercial speech. *Id.* The answer to this inquiry will help illuminate whether the regulation directly advances the governmental interest and is more extensive than necessary to serve that interest. *Id.* at 371, 373, 122 S.Ct. 1497 (noting that "we have made clear that if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so" and that even with commercial speech, "regulating speech must be a last—not first—resort.").

Tyndale notes that narrower limitations could achieve the Legislature's desired objectives by requiring, for example, reasonable disclaimers or disclosures that certificates and diplomas Tyndale may issue are not approved by the State and that Tyndale itself is not accredited by the State. The Supreme Court has recognized "the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required" rather than a ban on commercial speech. *Bates*, 433 U.S. at 384, 97 S.Ct. 2691; *see, e.g., Peel*, 496 U.S. at 110, 110 S.Ct. 2281 (providing similar disclosure examples); *Cent. Hudson*, 447 U.S. at 570, 100 S.Ct. 2343 (holding the state's interest could be addressed by including accurate descriptive information rather than banning the speech); *Strang*, 884 F.Supp. at 510 (holding the same with respect to statute that prohibit-

ed use of "Ph.D." or the title "doctor" unless obtained from an institution recognized by the state). Such measures may achieve the State's desired objective and be more likely to provide useful and accurate information to contribute to the public's decisionmaking than would banning all such information from the institution. *See Ibanez*, 512 U.S. at 142, 114 S.Ct. 2084.[16] In the present context, reasonable disclaimers regarding the theological certificates and diplomas could serve to better inform the public of Tyndale's students' educational achievements than would a complete ban on their ability to accurately describe such achievements. The Education Code currently includes such a disclosure for the granting of honorary degrees. TEX. EDUC.CODE § 61.312. Thus, I conclude the State has not carried its burden of showing that its regulation of this commercial speech directly advances its interest because the regulation is more extensive than necessary to serve the Legislature's legitimate purposes. *See Cent. Hudson*, 447 U.S. at 570, 100 S.Ct. 2343.

## IV

### Conclusion

Accordingly, I would reverse the court of appeals judgment and vacate the fines assessed by The Texas Higher Education Coordinating Board against HEB Ministries.

---

**16.** Some states have adopted this scheme and allow unaccredited religious institutions to grant degrees if certain disclosure require-

ments are met. *See, e.g.,* FLA. STAT. § 1005.06(f)(3); MD.CODE EDUC. § 11–202(c)(2).